(No. 22970.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOU E. DAVIS, Plaintiff in Error.

*Opinion filed February 14, 1936.*

CAMERON LATTER, and PETER MONTAGUE, (THOMAS J. McCORMICK, and CHARLES P. R. MACAULEY, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, HENRY E. SEYFARTH, JOHN T. GALLAGHER, RICHARD H. DEVINE, and MARTIN WARD, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Lou E. Davis, a regularly licensed physician and surgeon, was indicted in the criminal court of Cook county for the murder of Gertrude Gaesswitz by means of an abortion. She was found guilty by a jury and her punishment was fixed at fourteen years imprisonment in the penitentiary. Motions for a new trial and in arrest of judgment were made and denied. The defendant prosecutes this writ of error.

Louis Gaesswitz and Gertrude Gaesswitz, his wife, twenty-seven years of age, had been married for seven years and lived in the city of Chicago. She had given birth

to three children, only one of whom was living. In the early part of January, 1934, Gaesswitz consulted Dr. R. N. Hutchison, their family physician, concerning his wife's condition. He informed the doctor that he feared she was pregnant, adding that she did not desire to have another child but that he was opposed to interrupting the pregnancy. On this occasion it was arranged that Gaesswitz should send his wife to the doctor for an examination. On January 13, Mrs. Gaesswitz, unaccompanied, visited Dr. Hutchison at his office. He examined her, found that she had been pregnant for about two months and advised her to avoid an operation. The next day Gaesswitz and his wife visited her father, Daniel W. Allen, and the latter mentioned the defendant, Dr. Davis. On January 19, six days after the examination by Dr. Hutchison, Mrs. Gaesswitz, again alone, consulted the defendant. Gaesswitz accompanied his wife to the defendant's office on January 22. They made another visit to the defendant's office on January 24. The following Sunday, January 28, Mrs. Gaesswitz and her young daughter spent the day at her father's home, located seven or eight miles from the Gaesswitz apartment. Gaesswitz went hunting on that day and called for his family late in the evening. During the afternoon a sudden change in the weather had caused a drop in the temperature to zero. Gaesswitz and his family left Allen's home about 11:00 P. M. and walked two blocks to board a street car. They waited about ten minutes in the extreme cold before a car appeared. Shortly after midnight they arrived home. The day after her exposure to the cold Mrs. Gaesswitz complained of pains in her back and in her shoulder-blades. The defendant called on her that day. On Friday, February 2, her condition became alarming. Her husband called the defendant on February 3. She examined Mrs. Gaesswitz, stated that she thought the patient had pneumonia and advised Gaesswitz to summon a specialist on lung diseases. He, however, called Dr. Hutchison. The

latter visited the patient several times between February 5 and 8. After Dr. Hutchison's visit on February 5 a representative of the city health department placed a pneumonia sign on the door of the apartment. This sign remained there until February 8, 1934, the day on which Mrs. Gaesswitz died.

The husband of the deceased, Louis Gaesswitz, a C. W. A. employee, testified that he had never heard of the defendant prior to January 14 when he and his wife visited her father; that his wife was not bleeding on the occasion of her first and second visits to the defendant; that she took out a "pack" on January 21, and that if she had been bleeding from her private parts she would have told him; that on January 22, the first time he went to the defendant's office, and, again, on January 24, he remained in the reception room while his wife was in the private office; that on both days she was fully clothed when she came out; that on the 22d they were at the office about twenty-five minutes and went home on a street car, and about an hour on the 24th, after which they went home in a cab. According to his testimony, Mrs. Gaesswitz became sick on the afternoon of January 24 between the time they left the defendant's office and before they arrived home. The witness did not elaborate and it does not appear that the illness mentioned interfered with the performance of her household duties by the deceased as the witness stated that she prepared his evening meal on January 24 and all of his meals thereafter until the 2d or 3d day of February.

Dr. Hutchison testified that he had known the deceased and her husband two years and that the former was in good health when he examined her on January 13. The witness did not see her again until the early morning of February 5. From his testimony it appears that he made no vaginal examination at that time; that he found nothing wrong with her lungs; that he did find, however, a very marked distention of the abdomen; that a distended ab-

domen is always associated with peritonitis, and that his final diagnosis was septicaemia—an infection flowing in the blood stream, which can be caused by any number of different things. Dr. Hutchison expressed the opinion, based upon his examination of the deceased the times he called on her between February 5 and 8, that she was suffering from "septicaemia, due to abortion." On cross-examination the witness admitted that he might have reported to the health department that Mrs. Gaesswitz had pneumonia.

The coroner's physician of Cook county, Herman A. Jacobson, made the post-mortem examination. He described in minute detail the result of his internal examination and his findings, and stated that he found nothing present typical of pneumonia. This witness testified that from the post-mortem examination he had formed an opinion as to the cause of death. Upon interrogation he said: "In my opinion the death of Gertrude Gaesswitz was a result of septicaemia—that is, blood poisoning following septic or infected traumatic, meaning with force, mechanical abortion." This and a similar question were objected to and a motion to strike the testimony on the ground that it invaded the province of the jury was made. The objections were overruled and the motion denied.

The defendant was fifty-eight years of age at the time of the trial and had been engaged in the practice of medicine and surgery in Chicago for more than twenty-two years. She testified that although she had known Daniel Allen for many years she was not acquainted with his daughter, the deceased, prior to January, 1934. It appears from the defendant's testimony that when Mrs. Gaesswitz came to her office on January 19, the defendant took the patient's history and upon examination found that she was pregnant; that her womb was low down in the pelvis, and that the cervix had a fish-mouth tear which had healed but was dribbling mucus streaked with blood. The defendant testified that she put a medicated cotton tampon in the vagina

and directed the patient to remove it in twenty-four hours; that the only other treatment she gave her at that time was confined to a palpation of the abdomen; that on January 22 she placed the patient on a table, examined her and found that although the tampon had been removed there was still a discharge of mucus and blood; that she, the defendant, used a curette to clean out the debris that might be contained in her uterus; that a speculum was used to stretch the vagina so that the cervix or mouth of the womb could be seen and that then the curette was used; that the curette instrument is spoon shaped; that no anesthetic was administered and that the whole process took about fifteen or twenty minutes. The defendant stated that as a physician and surgeon she considered this a proper and necessary course of treatment. The examination of Mrs. Gaesswitz on January 24, according to the defendant, was a perfunctory matter as the patient was normal on that day. The defendant denied having performed an abortion upon Gertrue Gaesswitz for the purpose of relieving her pregnancy but testified, on the other hand, that she did a physiological curettement. She received $25 for her services.

The record discloses that when the defendant was placed on trial the second time, (the jury at the first trial having been unable reach a verdict), it was upon a "plea of not guilty heretofore entered." She maintains that this was not a proper arraignment. This court, in *People* v. *Evenow,* 355 Ill. 451, held that a recital in the record that a plea of not guilty had been theretofore entered, was sufficient to show that the plea had in fact been entered, and that the objection to the method of arraignment was waived by proceeding to trial. This contention cannot be sustained.

The defendant contends that the evidence fails to establish her guilt beyond a reasonable doubt. Section 3 of the Criminal Code (Ill. State Bar Stat. 1935, p. 1150; Smith's Stat. 1935, p. 1111;) provides that "Whoever, by means of any instrument, medicine, drug or other means

whatever, causes any woman, pregnant with child, to abort or miscarry, or attempts to procure or produce an abortion or miscarriage, unless the same were done as necessary for the preservation of the mother's life, shall be imprisoned in the penitentiary not less than one year nor more than ten years; or if the death of the mother results therefrom, the person procuring or causing the abortion or miscarriage shall be guilty of murder." The defendant insists that proof of two essential elements of the offense of murder by abortion are wanting, namely, that instrumentation or other means was used by her to produce an abortion, and, in the alternative, that the abortion was not caused for the purpose of saving the life of the deceased. To sustain the judgment the People contend that the *corpus delicti,* the use of an instrument to produce an abortion, and the intent to commit a criminal abortion, were all proved by the circumstances and facts in evidence.

The evidence discloses that although the deceased desired to have an abortion performed her husband opposed her wishes and urged the family physician to discourage her and that the latter strongly advised against an operation. While the defendant admitted that she performed a physiological curettement and that she used a curette instrument to perform the acts which she described with particularity, she denied performing an abortion for the purpose of relieving the pregnancy. Proof of the use of an instrument, medicine, drug or other means for the purpose of producing an abortion will not necessarily establish criminal intent. The statute defining murder by abortion specifically excepts from the penalties which it prescribes any person who produces an abortion for the necessary purpose of saving the life of the mother. An indictment charging abortion must negative every exception specified by the statute. (*Beasley* v. *People,* 89 Ill. 571.) Since it is essential to negative the fact that the abortion was caused or performed for the purpose of saving the mother's life, com-

petent proof to negative that fact is necessary. The criminal intent necessary to be established to convict an accused charged with committing an abortion, is the intent to commit a criminal abortion, that is, an abortion for a purpose other than to preserve the life of the mother. *People* v. *Hobbs*, 297 Ill. 399.

To sustain the conviction the People rely upon certain circumstances to prove criminal intent. Our attention is directed to the testimony of Dr. Hutchison who stated that the deceased was in good health on January 13, 1934, when he examined her. It is also true that her husband testified that her health was good on January 22, the occasion of his first visit to the defendant's office, and that she was not bleeding from her genital organs on the day named. His conclusion rests, however, upon the statement that if she had been bleeding she would have said something about it. Although the deceased desired to relieve her pregnancy it appears that her husband wished her to leave it intact and that their family physician advised against an operation. Under these circumstances it may well be that if Mrs. Gaesswitz had injured herself contrary to her husband's wishes she would have been reluctant to tell him. Again, although Gaesswitz said he examined his wife on January 21, he did not claim to have been present when she removed the tampon on that day. The defendant's uncontradicted testimony, on the other hand, discloses that when the deceased first visited her she, the defendant, found that mucus streaked with blood was exuding from her genital organs. Gaesswitz brought the deceased to the office of the defendant three days later. From his positive testimony it clearly appears that while he was opposed to having a criminal abortion performed he twice accompanied his wife to the defendant's office. This fact would indicate that their calls were not for the purpose of having a criminal abortion performed but for such treatment as was then imperative. The evidence does not justify the inference that he had yielded

in his opposition to interrupting the pregnancy and had become an accessory to a criminal offense. From her examination of the patient on January 22 the defendant testified that she reached the conclusion that the infected condition present could not be cured by tampons and that resort to a curettement was necessary. Neither of the People's two medical witnesses testified that the treatment rendered by the defendant was improper or that it was not necessary to preserve the life of the deceased. Nor did any witness testify that fatal consequences were not likely to result if the pregnancy had been allowed to proceed with the organs of the mother in an infected condition or that a more efficacious remedy should have been employed. Dr. Hutchison's testimony that the deceased was suffering from septicaemia due to abortion is impaired by the fact that a pneumonia sign was on the door of the Gaesswitz apartment on the four days he attended the deceased in her last illness. Furthermore, he admitted that he might have reported to the city health authorities that Mrs. Gaesswitz had pneumonia. Although the post-mortem revealed a diseased condition throughout the body, the coroner's physician did not designate any specific injury which indicated the source of septicaemia. If it be conceded that the evidence warrants the conclusion that death was the consequence of septicaemia, the concession cannot avail the prosecution as it may have resulted from the prior infection rather than the operation performed by the defendant. The septicaemia, according to the medical testimony, may have resulted from a number of causes. In particular, it may have resulted from the infected condition which the defendant described and treated. Moreover, six days intervened between Dr. Hutchison's examination of the deceased and her first visit to and examination by the defendant. During this interval she may have resorted to some expedient and abandoned it. The condition described by the defendant might have developed therefrom or from other causes

between January 13 and 19. The circumstances relied upon to show criminal intent are not convincing and fail to prove beyond a reasonable doubt that the abortion or curettement performed by the defendant was not necessary for the preservation of the life of the deceased.

The remaining contention which requires consideration is that the remarks of the assistant State's attorney in his closing argument were inflammatory and prejudicial to the defendant. Specifically, he said: "The table of the abortionist," "I say it was an abortion. It was the table of Dr. Lou Davis, the abortioner," and "She put on the tampon. Another one of the tricks of the abortionist." In his concluding remarks the defendant was depicted as plying the trade of an abortionist. Repeated objections to these intemperate expressions of opinion were overruled. From them the jury could draw only one inference, namely, that the defendant was regularly engaged in the practice of performing criminal abortions. There is no evidence in the record that even tends to show that the defendant was an abortionist or that she plied the trade. In cases of murder by abortion the prosecution may show the commission of like offenses to prove criminal intent. (*People* v. *Rongetti,* 338 Ill. 56; *People* v. *Hobbs, supra; People* v. *Hagenow,* 236 Ill. 514.) Such evidence is completely lacking in the present case. Nor is there any evidence to warrant the inference that the table used by the defendant was in any respect different from those regularly used by physicians and surgeons in the legitimate practice of their profession. A conviction must rest upon positive proof and not upon impassioned argument unjustified by competent evidence. (*People* v. *Deal,* 357 Ill. 634.) The statements assailed were not legitimate inferences from the facts proved.

The judgment of the criminal court is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

STONE, C. J., and JONES, J., dissenting.