[Crim. No. 5709.    In Bank.    Oct. 7, 1955.]

THE PEOPLE, Respondent, v. LOUIS STARKY
HOLBROOK, Appellant.

Bodkin, Breslin & Luddy and Henry G. Bodkin, Jr.. for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn. Chief Assistant Attorney General, and Victor Griffith, Deputy Attorney General. for Respondent.

GIBSON, C. J.—After a trial by jury, defendant was convicted of abortion and of attempted abortion. A new trial was granted on the attempt charge, and that count was later dismissed on motion of the district attorney. Defendant has appealed from the judgment and order denying a new trial as to the charge of abortion.

Miss Solis, the person upon whom the abortion was assertedly committed, became pregnant while she was living with one Goldstein. Goldstein called defendant, a licensed chiropractor, on the telephone and discussed the possibility of procuring an abortion. Thereafter, on March 9, 1953, Miss Solis and Goldstein went to defendant's office for the purpose of having the abortion performed. Defendant told them that he would charge $150 for the abortion, and, when Goldstein said he had only $50, replied that it was not enough. Defendant then examined Miss Solis, said he was sure she was pregnant, treated her for an infection, and told her and Goldstein to come back the next evening for the abortion if they could obtain more money. He instructed them that, when they returned, they should pay so much of the money to him and so much of it to his nurse so the nurse would not think that something was wrong.

On the following night Miss Solis and Goldstein again went to defendant's office. Goldstein told defendant that the only additional money he could obtain was $25 but that he could pay the rest later, and defendant said, "O.K." Defendant examined Miss Solis, informed her that the infection had cleared, and then used a syringe to put a brownish colored liquid in her uterus. He told her that she would have her menstrual period in a few hours and that she should stay in bed if she had any pain.

Miss Solis went home and, about two hours after leaving the office, had cramps and commenced menstruating. Two weeks later she became very sick, had a hemorrhage, and was taken to a hospital where she remained for four days. The doctor who examined her at the hospital testified that there was evidence of hemorrhage from the uterus, that she had a mild infection and was in the process of having a miscarriage and that there was nothing to indicate that an abortion was necessary to save her life. He also testified that any fluid, including distilled water, if inserted in the uterus, could produce an abortion.

On March 26 a police officer, after having talked to Miss Solis, called defendant on the telephone, said that his wife

was pregnant, that he had the same problem that Goldstein had and that he had been referred to defendant by Goldstein. An appointment was made for that afternoon, and defendant stated that the price would be "One and a half." The officer and a policewoman went to defendant's office, and the officer introduced himself and the policewoman as being a married couple. Defendant asked if they were in touch with Goldstein. adding that Goldstein owed him $75 and that he "would like to check with his patients of that sort to see if they were all right." Defendant also asked the policewoman how long she had been pregnant and when her last menstrual period was. He said he would help her but that he had to be very careful, that the price would be $150 and that they were to give him $140 and then pay $10 to the girl at the reception desk because none of his employees knew he was doing this work. He added that he would rather be paid then to avoid difficulty in obtaining payment later "because you know this is illegal." The policewoman asked defendant if he would explain to her what was to take place and what was to be expected of her as to the treatment, and defendant replied that she was to pretend that it was nothing more than a pelvic examination, that he intended to use an astringent to cause the uterus to contract and eject what was inside and that some 12 to 24 hours later she would discharge blood clots When asked if there would be anything to worry about in regard to the fetus, he said no, that everything would be taken care of. Defendant told the policewoman that she should remove her clothing and put on a gown that he would give her. She and the officer gave defendant $140 in currency and the officer left the room. He then signaled to another officer who had remained outside the building, and the two officers entered and placed defendant under arrest.

The officers questioned defendant as to what he had done with regard to Miss Solis, and he described a procedure similar to that shown by the evidence set forth above. When asked to point out the instruments he had used on Miss Solis, he went to a sterilizer, opened it and showed the officers a speculum, syringe and a small amber colored bottle about half full of a liquid. At one time he said the bottle contained a mild astringent and at another time stated that it contained distilled water. Defendant admitted to the officers that the money he had received was to be remuneration for performing an abortion on the policewoman. He also stated, "This is going to ruin me. I have a very good practice, legitimate

practice. When my patients find out that I do abortions, it will ruin me." When asked if he had done an abortion upon a Violet Solis, he replied that he had. He stated that the injection of the astringent solution was supposed to "make her lose the baby." Subsequently defendant said that he had injected distilled water into her cervical canal.

Defendant testified in his own behalf, admitting that he had treated Miss Solis for an infection but denying that he had been informed that either Miss Solis or the police-woman was pregnant or that he had used instruments or any substance on Miss Solis for the purpose of producing an abortion. He denied making some of the statements attributed to him by the police officers, for example, that he had injected water into her cervical canal, that he had told the policewoman that in 24 hours after treatment she would discharge clots of blood, or that he had used an astringent fluid. He did not testify as to whether he had told the officers that he had performed an abortion upon Miss Solis or whether he had admitted to them that he had received money as remuneration for performing an abortion upon the policewoman.

A chiropractor associated with defendant testified that she was in attendance with defendant upon both occasions when he examined Miss Solis, that Miss Solis had a bad inflammation, and that defendant treated Miss Solis each time by cleaning the inflamed area with water, using the syringe and some cotton and applying an antiseptic solution and some packing.

█ The evidence is clearly sufficient to support the conviction of abortion under the first count of the information.
█ The evidence is not sufficient to support the conviction under the second count since the record relating to the asserted attempted abortion upon the policewoman shows merely preparation and no direct, unequivocal act toward the commission of an abortion. (*People* v. *Gallardo,* 41 Cal.2d 57, 66 [257 P.2d 29].) █ Defendant contends that he was prejudiced with respect to the first count because of the refusal to grant his request that the court advise the jury to acquit defendant of the charge embraced by the second count.* Although the trial court should have advised the jury to

---

*Defendant made a motion for a "directed verdict" as to the second count rather than a request that the court advise the jury to acquit, but it has been held that a request for a directed verdict may be treated as a request for an advised verdict under section 1118 of the Penal Code. (*People* v. *Ward,* 145 Cal. 736, 738-740 [79 P. 448].)

acquit defendant upon the second count, that count was dismissed after the granting of a motion for new trial with respect to the charge of attempted abortion. ▮ It is of course proper to try a defendant, at one time, upon two or more different offenses of the same class, and it would defeat the purpose of this procedure if we were to hold that error in submitting to the jury a charge which is not supported by the evidence requires a reversal as to charges which are supported. The record contains nothing to justify defendant's assertion that the prosecution was guilty of bad faith in trying the two counts together.

▮ There is no merit to defendant's claim that the trial court, upon its own motion, should have instructed the jury that the evidence of defendant's intent to commit an abortion upon the policewoman could not be considered in arriving at a verdict on the charge of an abortion upon Miss Solis. When the evidence of the events relating to the policewoman's visit to defendant's office was offered and received, defendant made no objection on the ground that it should be admitted only for purposes of the count charging an attempted abortion, and he did not request an instruction that the jury could consider it only for a limited purpose. ▮▮ It is true that in some situations a court must, of its own motion, instruct upon the law relating to the facts of the case and upon matters vital to a proper consideration of the evidence (see *People* v. *Yrigoyen, ante,* pp. 46, 49 [286 P.2d 1]; *People* v. *Buffum,* 40 Cal.2d 709, 724 [256 P.2d 317]; *People* v. *Bender,* 27 Cal.2d 164, 174 et seq. [163 P.2d 8]; *People* v. *Putnam,* 20 Cal.2d 885, 890-891 [129 P.2d 367]), but the court, in the absence of a request, was not required to give an instruction limiting the purposes for which the evidence could be considered (*People* v. *Weitz,* 42 Cal.2d 338, 347 [267 P.2d 295]; *People* v. *Simeone,* 26 Cal.2d 795, 808 [161 P.2d 369]; *People* v. *Northey,* 77 Cal. 618, 631 [19 P. 865, 20 P. 129]). ▮ The court properly instructed the jury that each count charged a separate offense and that the jury "must consider the evidence applicable to each offense as though it were the only accusation." This instruction would not necessarily preclude the jury from treating particular items of evidence as being applicable to both counts, but if defendant desired a more specific instruction, he should have asked for one. In view of our conclusion upon this question we need not determine whether, as asserted by the prosecution, evidence of defendant's intent to commit an abortion

upon the policewoman was admissible to show his intent to commit an abortion upon Miss Solis.

The trial court erred in failing to give an instruction, on its own motion, regarding the necessity for proof of the corpus delicti independent of defendant's admissions or confessions. (*People* v. *Putnam,* 20 Cal.2d 885, 890-891 [129 P.2d 367]; *People* v. *Frey.* 165 Cal. 140, 147 [131 P. 127]; *People* v. *Dobkin,* 74 Cal.App.2d 269, 277-278 [168 P.2d 729].)

After an examination of the entire record, however. we feel that it is highly improbable that a different verdict would have been reached if the court had given such an instruction. The corpus delicti was amply established by the testimony of Goldstein, Miss Solis and the doctor who examined her at the hospital. While the testimony of defendant and the other chiropractor associated with him tends to show that no crime was committed and that Miss Solis merely received treatment for an infection, the testimony of the other chiropractor is not strong. This witness was not permitted, for lack of proper foundation, to state whether she observed anything which, in her opinion, would produce an abortion, and her testimony, even if believed, would not necessarily contradict the evidence that defendant had used the fluid in the syringe for the purpose of inducing an abortion as well as for cleaning the infected area. Under all the circumstances, a miscarriage of justice did not occur.

The judgment and the order denying defendant's motion for a new trial are affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.