[Crim. No. 6222. Second Dist., Div. One. Feb. 13, 1959.]

THE PEOPLE, Respondent, v. FRANCIS EDGAR
BALLARD, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, and Arthur C. de Goede, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment and order denying the defendant's motion for a new trial upon two counts of abortion.

In count II of an information filed by the district attorney of Los Angeles County the defendant was charged with performing an abortion upon Martha Frances Gresham on June 10, 1957, and in count III thereof he was charged with performing an abortion on Alice Hankerson Frank on July 12, 1957. A jury heard the evidence and found the defendant guilty on both counts. The defendant's motion for a new trial was denied. The defendant was sentenced to the state prison, the sentences to run concurrently. Sentence was then suspended and the defendant was granted probation for six years on condition, among others, that he pay a $1,000 fine.

It may be well to say at the outset in this case that a great deal of misunderstanding would be avoided in abortion matters if they were considered in the light of the fact that an abortion is not necessarily, in and of itself, an illegal procedure or act. In other words, not all abortions are illegal.

The defendant is a medical doctor practicing his profession

in an office in Beverly Hills and at his home in Reseda. He received his bachelor's degree from the University of Washington, graduated from the medical school at Stanford University, worked for one and one-half years in the Department of Obstetrics and Gynecology at Stanford, went to Harvard University for a year on a scholarship and received a master's degree. He was appointed as a medical officer for the California State Department of Health. He has been employed as a Divisional Director of the Los Angeles City Health Department. During World War II he served as a doctor in Walter Reed Hospital and was in charge of a hospital in Africa. He taught at the University of California and also at the University of California at Los Angeles. He has delivered hundreds of babies and has written many articles for various magazines and newspapers.

The facts of this case are essentially as follows: Martha Gresham called and talked with the defendant on May 8, 1957, over the telephone. She said she had a problem, but did not elaborate upon what the problem was. Mrs. Gresham, with her 3-year-old boy, went to the doctor's home office in Reseda on May 10, 1957. She told the doctor that she thought she was pregnant and that she understood he could take care of her. The defendant took her blood pressure and pulse and got some history of her background. She told the doctor that she had been and was very nervous; that she had three children who lived with her; that she had had two miscarriages, and that she had considerable trouble throughout the years with her menstrual periods; that she had seen doctors from time to time about it, and had received shots because of irregularity of her menstrual periods, and that her last menstrual period had been about March 18, 1957. He told her that he did not think she was pregnant and that her nervousness and other conditions might very well have caused the delay in her menstruating. The doctor gave her some pills for her nervous condition and an injection of some medicine.

She insisted that she wanted a laboratory test and indicated from her actions dissatisfaction with the diagnosis of the doctor. She was then sent by the doctor to an independent laboratory where a so-called rabbit test was made upon Mrs. Gresham on May 14, 1957. About three days later she called the doctor to ascertain the results of the rabbit test at the laboratory and was told by the doctor that the laboratory representative had advised him that the test was negative. He again told her that he did not think she was pregnant.

She continued to believe that she was pregnant, and again went to see the doctor. Without informing the doctor, she went to the laboratory again on or about May 29, 1957, and had the technicians at the laboratory run another rabbit test. She then told the doctor about having the second laboratory test and wanted to know if he could get the results of such test. The doctor got the test result, which was positive, and told her of the laboratory's finding. The doctor, however, advised her that in his opinion, in spite of the report, she was not pregnant.

About June 3, 1957, she went to the doctor's office in Reseda and he examined her and then told her that it was his then belief that she was pregnant. She explained then that she was in trouble because her husband was in the City of Hope and had had no access to her, and that it was another man's child, namely a man by the name of Cayce. At first she had told the doctor that the child was her husband's child. She asked the doctor if he could help her, and she testified that he stated that he could and that the cost would be $300 to abort her. She further stated that she would try to get the money, and he said that he could not do it without the cash.

On about June 10, 1957, she again went to the doctor's home office accompanied by Patrick Cayce. She stated that the three of them then talked about the money, or lack of money. The doctor wanted cash. Cayce said that he could give the doctor a promissory note payable on an installment basis, to which the doctor finally agreed. A note was made out in the principal sum of $300 and signed by Cayce and returned to the doctor. Cayce then left the room which was used as the doctor's office and went to the front room of the house.

The defendant gave Mrs. Gresham an injection in the arm, which made her drowsy. She undressed and put on a hospital gown and then went to the bathroom. She returned, got on the examining table and was lying on her back with her legs spread apart. The doctor apparently cleansed her with some soap solution. She then felt something in her "privates" which she said felt as though she was being opened up with some sort of an instrument. She felt a pulling sensation up to her stomach. Later the doctor got up and told her to continue to lie upon the table. He asked Cayce to go to a store and get a sanitary belt. Cayce did so and gave it to the defendant. Mrs. Gresham never saw any instrument in the

hands of the doctor, and saw no blood at the time of the examination.

The doctor told her to call him later, and to make an appointment after she stopped flowing. Except as to her nervous condition, Mrs. Gresham, from a layman's point of view, appeared outwardly to be in good health when she went to see the doctor. She was not pregnant after June 10, 1957. She had cramps after she left the doctor's office and blood flowed for six weeks thereafter.

Mrs. Gresham did not see any other doctor between June 10th and July 30th, and was not examined by any doctor at the request of the prosecution. Cayce wrote a check on June 17, 1957, for 50 dollars as a part payment on the promissory note, and mailed the check to the doctor. Cayce testified that he never received a letter from the doctor or the check back. However, the fact is that the check was received in evidence without objection, and shows on its face that it was written on "6-17-1957" and that it was cancelled as "Paid 6-19-57." In the latter part of July, Cayce talked with the doctor and inquired whether Mrs. Gresham was all right. The defendant told Cayce of his arrest and asked for the balance upon the promissory note.

Cayce testified, among other things, that he went with Mrs. Gresham to the office of the doctor on June 10, 1957, and that the three of them talked together. Cayce stated that the doctor said that he wanted cash for the abortion. He further testified, in effect, that Mrs. Gresham had said that he, Cayce, was "the father of any child that she expected." Cayce also stated, without reservation, that he had first met Mrs. Gresham some time in May of 1957. The court sustained the objections of the prosecution to any questioning of Cayce as to whether he was the father of the expected child. It is difficult for this court to understand just how Cayce could have admitted, in effect, to being the person who brought about the alleged pregnancy of Mrs. Gresham in March of 1957, as represented by the prosecution, when he, Cayce, apparently, by his own testimony, did not even know Mrs. Gresham until May of 1957.

Alice Hankerson Frank, referred to in the third count, was an "operator" for the State Board of Medical Examiners. She had been married on July 5, 1957. She attended school of some sort and at the time of trial apparently was teaching school in El Monte. She stated that on July 11, 1957, she called the defendant on the telephone supposedly from San

Francisco, and made an appointment for the next evening. In that conversation she said that she told the doctor she was three weeks over her menstrual period and that she had been referred to him by a girl friend in San Francisco. Mrs. Frank's further testimony indicates that she made inquiries about how much money she would need, and that the doctor stated, in effect, that $300 would be all right. Mrs. Frank told the doctor that her boy friend had the money, and that he would bring her down from San Francisco.

Mrs. Frank first saw the doctor in the evening on July 12, 1957, at his home office. She went there with Robert Truitt, an investigator for the State Board of Medical Examiners. The defendant was in the yard when they approached and he invited them into the house upon their stating to him that she was the girl who had called him from San Francisco. Truitt testified that he asked if Mrs. Frank would be able to have any more children after the abortion, and the defendant replied that she would be all right and could have children; that he was a medical doctor, a professional man, not a quack, and that he was competent to operate. Mrs. Frank testified the doctor stated that he would curette her; that he would go into her womb and scrape the fetus loose, and that it would come out and she would be all right. She said she also asked about whether it would be painful and whether there would be much bleeding: that the doctor told her that she would bleed a little, but not much, and that she would be troubled with cramps.

She said that she went into the office of the doctor where she and the doctor were alone, and that the doctor asked questions. Truitt, during that period of time, waited in the living room. She told the doctor her name was Alice Hanson, and that she was from San Francisco, and that her companion was named Bob Trout. The doctor wrote this information upon a piece of paper and put it into his pocket. Her testimony was that the doctor asked how long she had been pregnant and how she had been feeling. She stated that she had missed her period due about three weeks before. She further testified that the defendant then stated that he would abort her for $300, and that he would like to give her a tranquilizer shot. He said it was not a drug and that he wanted her relaxed when he performed the operation. That he gave her an injection of one c.c. of Demarol and one c.c. of Dramamine. That at the defendant's suggestion they then went into the living room

where Truitt was seated. That she told Truitt of the injection in the arm, which the doctor verified, and that the doctor said it would relax her so that he could go ahead with the abortion.

Truitt testified that he inquired of the doctor whether he was a medical doctor, and that the defendant replied, ''Yes, I am a qualified medical doctor. I know what I am doing, and she won't have any after-effects from this abortion.'' The doctor then told Mrs. Frank to empty her bladder and showed her to the lavatory. The doctor returned to the front room and inquired of Truitt, ''Well, who is going to pay? Is she going to pay the $300 or are you going to pay?'' Truitt asked if he couldn't abort her for $250, and the defendant replied, ''No, I can get in a lot of trouble. I can lose my license and go to jail for doing abortions, and I have got to stick to $300 cash. Have you got it?'' Truitt then took $300 from his pocket which he had obtained from State funds, and started to count it out. The money was on the settee when Mrs. Frank returned to the room. Truitt then gave the money to the defendant and said, ''Here is the full $300 for the abortion, Doctor.'' The defendant left the room with the money and then returned and took Mrs. Frank into the operating room, told her to undress and put on a gown, and then he returned to the living room where he told Truitt not to be worried about her, that he knew what he was doing and that Truitt would not have the problem after the abortion. The doctor returned to the room where Mrs. Frank was and helped her on to the table where Mrs. Frank placed her legs in stirrups, with her legs spread apart. The doctor washed the vaginal area with some sterile solution and then inserted a vaginal speculum into her body, explaining that this was so that he could get in with other instruments to clean her out. She screamed for ''Bob'' and insisted that he be present. The defendant tried to quiet her, and then opened the door and called for Bob to come. The doctor explained that she was upset and had gotten scared and didn't want to go ahead with it. With the three of them present in the operating room, the doctor inserted the vaginal speculum into Mrs. Frank's body and made some adjustments. The doctor then picked up some sponge forceps, which contained some cotton in their grip, and started to enter the vaginal cavity. When Truitt heard the forceps (which were holding the small ball of cotton) strike against the speculum, he identified himself

as a special investigator for the State Board of Medical Examiners and arrested the defendant.

Truitt, at the time of pulling out his identification card, which he held in his right hand, also pulled out a "snubnosed Smith and *Weston* .38 five shell revolver." Truitt said that although he had the gun in his hand, he did not point it at the defendant, that it was "dangling" in his left hand. That he told the doctor "just . . . stand there and don't make any motions at all." The defendant replied, in answer to the request to be cooperative under the circumstances (that is, with the investigator standing with gun "dangling" in hand), by saying, "Yes, I'll be glad to. You have caught me cold." Truitt, with the gun in his hand, though as he said, not pointed at the doctor, then had the doctor accompany him to the front door where Truitt gave a signal, and two Los Angeles police officers appeared. Truitt at the time of opening the door for the officers, according to one of the officers, had a ".38 revolver, with a two inch barrel in his left hand." The defendant was put into the care of the two police officers, and Truitt apparently ransacked the establishment for evidence. He stated that he located the $300 which had been paid to the doctor, and also some medical instruments and other matters. Pictures of Alice Frank were then posed for and taken in her semi-naked condition by another police officer. When the pictures of Alice Frank and the doctor were being taken, Truitt said, in answer to a question of the defendant as to whether he had to stay while such pictures were being taken, "Absolutely. You just do what I say." A statement was made by the doctor on a tape recording device, wherein the doctor said, among other things, that the woman had called him from San Francisco and implied that she was pregnant, that he assumed she was pregnant and that he was to interrupt such pregnancy. He also stated that he had aborted Mrs. Gresham in May of 1957 for a fee of $300, but that he had only received $50.

In passing, at this point it is interesting to note that, as heretofore indicated, the investigator testified in the first instance positively and without reservation that he paid $300 to the doctor. He was certain of the amount, and likewise Alice Frank was certain of the amount. The investigator stated that he had written down in advance the denominations and the serial numbers of the bills in question on a piece of paper which he had kept, and which paper was introduced into evidence. He said there were "ten five-dollar bills and

ten ten-dollar bills and five twenty-dollar bills.'' Likewise, he said that later on he recovered the bills from the doctor and checked each one off from his previously prepared list. The only difficulty is that the figures, as written down and as testified to, did not total $300, but only $250. The matter was called to the attention of the investigator a few days after he had testified, by the district attorney who said the figures ''didn't quite total $300,'' and he, the investigator, stated in effect that he would ''clear that up and explain the numbers,'' which he proceeded to do by testifying that he had counted them again and had them with him and there were ''seven twenties, eleven tens and five fives.'' This apparently satisfied everybody at the time, but by our calculations such amounts equal $275 and not $300.

The testimony with reference to the tape-recorded statement showed that Truitt asked the doctor if he could use the doctor's recorder for a statement. The recording machine was of a type which used a magnetized tape, which tape can be used over and over again. As one dictates onto the tape, what is then said automatically erases whatever is on the tape from any previous recording. The doctor testified that they conducted a ''dress rehearsal'' of the statement and that he was told by Truitt, ''You are going to have to make a statement . . . the way I want it.'' A statement was made by question and answer and then, as the doctor testified, such statement apparently did not satisfy the investigator and another, second statement was made, erasing the first statement which had been made.

As might be expected, the doctor's version of what occurred is substantially different from what has heretofore been related. He testified that insofar as Mrs. Gresham was concerned, his examination disclosed that the cervix was a little dilated and that bits of tissue protruded, which he identified as placenta membrane. This condition indicated to him, as a doctor (who, by virtue of his background and training, was skilled and learned in the science of gynecology), that she had theretofore lost the embryo, and that a condition of inevitable abortion was present, and that the only thing to do was to have a curettement; or as the testimony shows, the doctor said at the time to the people concerned, ''. . . she was in the state where she had lost the embryo . . . that she had retained the placenta—it is a state known as inevitable abortion or missed abortion.'' He stated further that he then removed the remnants of the products of the conception.

As to Mrs. Frank's case, the doctor denied that he had used the word abortion, as claimed by the investigator and Mrs. Frank, and stated in effect that from the history she gave him he believed that she might be suffering from some female trouble and that he thought it might even be a venereal disease. Further, that all he did so far as Mrs. Frank was concerned was to start to examine her to ascertain what her trouble was, and that he had no intention of performing an abortion. The doctor also indicated that the investigator pointed the gun at him and suggested that he, the doctor, cooperate in the making of statements under such circumstances.

The defendant now contends that:

(1) The evidence is insufficient to support the verdicts, and each of them.

(2) The trial court erred in giving instructions on:

(a) the general criminal intent;

(b) manifestation of intent.

(3) The trial court erred in failing to give the defendant's requested instructions on:

(a) act committed or omission made under an ignorance or mistake of fact;

(b) defense of entrapment;

(c) specific intent;

(d) confession and prima facie proof of the corpus delicti; and

(e) validity of expert testimony.

The defendant asserts that the burden is on the prosecution to show that the use of an instrument was not necessary to preserve the life of the woman. Such is a correct statement of the law. (*People* v. *Gallardo*, 41 Cal.2d 57, 62 [257 P.2d 29].)

The matter of the health of Mrs. Gresham was before the jury and the jurors had her story as to her condition of health, and also heard what the doctor had to say upon the subject matter. In short the issue, so far as the doctor was concerned, was whether in the exercise of his best skill and understanding in good faith, he believed that it was necessary to perform the work he did perform to save the life of Mrs. Gresham.

In this case it is admitted, at the very least, that Mrs. Gresham was *extremely nervous*. She apparently was *upset*, *had headaches*, was *unable to sleep*, and *thought that she was pregnant*. She was *agitated*, *disturbed* and *had many prob-*

814

*lems.* She knew her husband was in the hospital suffering from a severe ailment and that he had had no access to her, and that if she was pregnant it was because of her engagement in illicit intercourse with someone else. Such a showing would not seem to prove beyond a reasonable doubt and to a moral certainty that she was in good health and that treatment of some sort was not necessary.

Many people walk, without assistance, into hospitals and doctors' offices to have operations performed that are necessary to preserve and save life. Further, it is not a rare occurrence for a person who has gone to a doctor's office in apparently reasonably good health, only to learn from the doctor that he is afflicted with a fatal disease. Every presumption is in favor of the defendant's innocence.

It is uncontradicted that the doctor told Mrs. Gresham several times that in his opinion she was not pregnant—that the delay in her menstrual periods came about from other causes, and that he recommended treatment for such other conditions. No other doctor examined Mrs. Gresham or testified as to her condition. The testimony of the defendant is undisputed that he removed the remnants of the products of conception and nothing more, and that such course was necessary to her life and health. The prosecution offered no testimony to show that such was not the case.

True it is that the doctor did not say in so many words that it was necessary to save her life, but he did say that it would have been almost malpractice if he had not removed the tissue; that it was standard procedure, and that complications might well have ensued unless there had been a complete medical abortion, and that otherwise pieces could have grown to become polyps and cause hemorrhages.

Surely, the abortion statute (Pen. Code, § 274) does not mean by the words "unless the same is necessary to preserve her life" that the peril to life be imminent. It ought to be enough that the dangerous condition "be potentially present, even though its full development might be delayed to a greater or less extent. Nor was it essential that the doctor should believe that the death of the patient would be otherwise *certain* in order to justify him in affording present relief." (*State* v. *Dunklebarger,* 206 Iowa 971 [221 N.W. 592, 596]; see also *Rex* v. *Bourne,* [1939] 1 K.B. 687 (1938); *Commonwealth* v. *Wheeler,* 315 Mass. 394 [53 N.E.2d 4]; 23 So.Cal.L.Rev. 523.)

In *State* v. *Powers* (1929), 155 Wash. 63, 67 [283

P. 439, 440], the court satisfied itself with an interpretation of "necessity to save life" by stating, "If the appellant in performing the operation did something which was recognized and approved by those reasonably skilled in his profession practicing in the same community . . . then it cannot be said that the operation was not necessary to preserve the life of the patient."

Mrs. Gresham did not testify as to the passing of anything prior to the time of the operation, however, the doctor stated that she told him, in answer to a question along such lines, that she had had a few mild cramps but she did not recall passing anything. In any event, our view is that such is not controlling here: "If the fetus was dead, as disclosed by the diagnosis, that fact became a controlling one; and this was equally so whether the result was brought about by acts of the prosecutrix or by natural or other causes." (*State* v. *Dunklebarger, supra,* p. 596.) It is also stated in the Dunklebarger case, "*If the diagnosis of a regular physician discloses an internal condition of a patient which threatens his life, it may not be negatived by the mere fact that the patient is unconscious of it and feels well and is apparently well.* Fatal conditions are often found in patients who were wholly unsuspecting of their danger. If at the time of the examination . . . the fetus was dead, then danger to life was necessarily present even though the patient had not yet felt any discomfort therefrom." (P. 596.) (Emphasis added.)

The district attorney introduced no evidence whatever to establish or to prove that the diagnosis of the doctor was not correct. It must be kept in mind that the defendant in this case was a doctor with substantial experience and background, and an admitted expert in the particular field of gynecology.

It is set forth in 153 American Law Reports 1266, with reference to statutes having to do with abortions:

"By the weight of authority, the insertion of this exception in the body of the enacting clause [that is, "unless necessary to preserve the life of the mother"], requiring a denial of its saving facts in the indictment or information, makes the absence of those facts an ingredient of the corpus delicti, which the government must establish as part of its case, even in the absence of any evidence of their existence."

Also, in *State* v. *Wells,* 35 Utah 400 [100 P. 681, 136 Am.St. Rep. 1059, 19 Ann.Cas. 631], the court said (pp. 684, 685 [100 P.]) : "The state sufficiently proved that the woman was pregnant; that the defendant performed an operation on

her, and that she, in consequence of such operation, had a miscarriage. But the proof of such facts does not establish the crime of abortion as defined by the statute. Under such a statute it was also essential to prove that the miscarriage was not necessary to preserve the life of the woman. Until such fact was proven the body of the crime was not proven." The court therefore held that the alleged confession of the defendant was not sufficient to support the conviction, the corpus delicti not having been otherwise proved. The court further said, at pages 686-687 :

"If it was not necessary to produce the miscarriage to preserve the life of the woman, such fact could readily have been shown by the physician, who was a witness for the state, and who had examined the woman on the day that the alleged operation was performed, and by the woman herself, who was also a witness for the state. The observation made by the Ohio court that the circumstances attending the procurement of the abortion tending to prove that it was unnecessary to save the life of the woman *ordinarily can be shown quite as easily on the part of the state as by the defendant*, and that the rule as to the sufficiency of circumstantial evidence, as stated in Cyc., 'is strictly enforced where decisive, direct evidence is probably obtainable, but is not produced,' is here pertinent and applicable. When the physician and the woman, who were witnesses for the state, were not interrogated by it with respect to the health or physical condition of the woman, and the state failed to show by them, *or by other evidence,* that there was nothing in the condition of the woman to indicate any necessity for a procured miscarriage, it may be assumed that if the witnesses had been examined on such matters, the evidence elicited from them would have been against the state, or that the state overlooked the necessity of proving the negative in the statute, or else treated it as a matter of defense." (Emphasis added.)

The evidence of her health, under the circumstances, did not lie peculiarly within the knowledge of Mrs. Gresham. She could have been examined by doctors for the state, and independent information could have been secured which might have been helpful, had the state been so minded.

It is evident that the condition which she had, could have developed to a fatal stage before Mrs. Gresham became fully aware of it, or conversely, it might not have developed to the fatal stage. The condition nevertheless would be deemed dangerous to life.

In Illinois it has been held that there is a presumption of necessity in the case of an abortion *by a licensed physician* which cannot be overturned by a mere showing of prior good health. In *People* v. *Davis,* 362 Ill. 417 [200 N.E. 334, at p. 336], the court said:

"The evidence discloses that although the deceased desired to have an abortion performed her husband opposed her wishes and urged the family physician to discourage her and that the latter strongly advised against an operation. While the defendant admitted that she performed a physiological curettement and that she used a curette instrument to perform the acts which she described with particularity, she denied performing an abortion for the purpose of relieving the pregnancy. *Proof of the use of an instrument, medicine, drug, or other means for the purpose of producing an abortion will not necessarily establish criminal intent.* The statute defining murder by abortion specifically excepts from the penalties which it prescribes any person who produces an abortion for the necessary purpose of saving the life of the mother. An indictment charging abortion must negative every exception specified by the statute. *Beasley* v. *People,* 89 Ill. 571. Since it is essential to negative the fact that the abortion was caused or performed for the purpose of saving the mother's life, competent proof to establish that fact is necessary. *The criminal intent necessary to be established to convict an accused charged with committing an abortion is the intent to commit a criminal abortion, that is, an abortion for a purpose other than to preserve the life of the mother. People* v. *Hobbs,* 297 Ill. 399 [130 N.E. 779].'' (Emphasis added.)

We are of the opinion that the circumstances in this case relied upon to show criminal intent are not convincing, and fail to prove beyond a reasonable doubt that the abortion or curettement performed upon Mrs. Gresham by the defendant was not necessary for the preservation of her life.

We are also of the opinion that if it is necessary to the establishment of the corpus delicti that it be shown that an operation was not necessary to preserve the life of a woman, that then in this particular case there was no effectual establishment of the corpus delicti as to Mrs. Gresham.

▮ Defendant contends that the trial court erred in giving instructions on general criminal intent. Suffice it to say that the defendant offered the instruction and he may not now

complain. (*People* v. *Williams*, 128 Cal.App.2d 458, 463 [275 P.2d 513].)

The next contention of the defendant is that the giving of the instruction with reference to the manner in which intent is manifested, was in error. No authority is cited by the defendant for his position, and in any event, section 21 of the Penal Code covers the matter.

As to the assertion that the court erred in failing to give defendant's requested instruction on ignorance or mistake of fact, the defendant has cited no authority for his position and gives no argument in support of it. We therefore need not consider the point. (*People* v. *Foss*, 7 Cal.2d 669, 671 [62 P.2d 372].)

As to the court's refusal to give the defendant's requested instruction on proof of a corpus delicti independently of his extrajudicial admissions and confessions being prejudicial, the attorney general, with commendable fairness, concedes that the trial court erred in this respect. (*People* v. *Holbrook*, 45 Cal.2d 228, 234 [288 P.2d 1]; *People* v. *Tapia*, 131 Cal. 647, 652 [63 P. 1001].) However, the attorney general insists that the error was not prejudicial. We believe that such error, as heretofore set forth, under the facts and circumstances of this case, did constitute prejudicial error.

As to the contention of the defendant to the effect that the court erred in refusing to give his proposed instruction on expert testimony, suffice it to say that the court did instruct the jury in the language of Penal Code, section 1127b, and that section provides "[n]o further instruction on the subject of opinion evidence need be given."

Considering now more particularly the case involving Alice Hankerson Frank, with specific reference to the defendant's contention that the evidence is insufficient to support the verdict.

Mrs. Frank admittedly was not pregnant. She however told the defendant that she was pregnant; that she was suffering from some sort of female trouble; that she was about three weeks past her menstrual period. She stood by and heard Truitt represent, untruthfully, that she had had a baby or babies before. She was vague and indefinite about her physical history and purported to be very much afraid and frightened.

She herself testified that the doctor inserted the vaginal speculum and that he explained (at the time) that such was

done so that he could get in with other instruments to *clean her out*. This conduct is consistent with an ordinary examination and, in and of itself, would not mean that she was to be aborted. Truitt stated that when the doctor made the adjustment with the speculum, and then reached out with the sponge forceps with the cotton on the end thereof that he "believed" the doctor had started to enter the cavity and then made the arrest.

This court, speaking through Mr. Presiding Justice White, said in *People* v. *Murphy*, 60 Cal.App.2d 762 [141 P.2d 755], which involved a licensed physician: "The very gist of the offense charged against these defendants is that they used an instrument with intent thereby to procure the miscarriage of the woman named in the information. Therefore, unless there was actual knowledge on the part of defendant Murphy of the pregnancy of the woman, *or a belief upon his part that the woman was pregnant,* there could not exist the required and necessary intent upon his part to procure the miscarriage of such woman. The question therefore arises as to whether there was present in this case evidence, other than the testimony of the prosecutrix, of sufficient substantiality to warrant a conclusion by the jury of the requisite guilty intent upon the part of defendant Dr. Murphy (citing cases). In the legitimate exercise of his profession the defendant doctor was entitled to examine the prosecutrix to ascertain if she was pregnant, and if such examination established the existence of such a condition or gave rise to a belief upon the part of the doctor that she was pregnant; and he proceeded with the use of an instrument to produce or attempt to produce a miscarriage, then he was guilty of the offense charged against him. [P. 770.]

. . . . . . . . . . . . .

". . . As we view the testimony in this case, exclusive of that given by the prosecutrix, it is insufficient, as a matter of law, to establish the pregnancy of the prosecutrix or the fact that there existed in the mind of defendant Dr. Murphy a fully formed belief that pregnancy existed. The evidence being insufficient, as a matter of law, to establish an intent upon the doctor's part to cause a miscarriage, which is the gist of the offense, his conviction cannot be sustained (*People* v. *Richardson, supra,* [161 Cal. 552 (120 P. 20)])." [P. 772.] (Emphasis added.)

Similarly, in *People* v. *Gallardo, supra,* 41 Cal.2d 57, it is stated at page 66, "In order to establish an attempt [to com-

mit an abortion], it must appear that the defendant had a specific intent to commit a crime and did a direct, *unequivocal act toward that end; a preparation alone is not enough, and some appreciable fragment of the crime must have been accomplished.*" (Emphasis added.) (See also *People* v. *Holbrook, supra,* 45 Cal.2d 228, 232.)

The facts before us involve several questions: whether defendant's belief that Mrs. Frank was pregnant is established; whether defendant's intent to commit an abortion is sufficiently established; and whether what defendant had done was sufficient to establish that he was in the process of performing direct, unequivocal acts which he thought would result in a miscarriage.

In *People* v. *Raffington,* 98 Cal.App.2d 455 [220 P.2d 967], which did not involve a doctor but did involve some similar facts in other respects, it was stated at page 460: "Whenever the design of a person to commit a crime is clearly shown, slight acts done in furtherance of the design will constitute an attempt." In that case, however, by contrast to the one engaging our attention, the defendant by his own statements was habitually engaged in the unlawful enterprise and discussed the details of abortions performed on other women and the materials and instruments which he admittedly intended to use in producing the intended abortion.

In *People* v. *Berger,* 131 Cal.App.2d 127 [280 P.2d 136], it was stressed that the intent with which certain acts were done was established beyond any doubt with the result that the acts were held sufficient to constitute an attempt, the court stating (at p. 130) "*the drawing of the line between mere preparation and attempt in close cases is not an easy task.* It may be drawn from the cases that where the intent to commit the substantive offense is as clearly established as it is here acts done toward the commission of the crime may constitute an attempt, where *the same acts would be held insufficient to constitute an attempt if the intent with which they were done is equivocal and not clearly proved.*" (Emphasis added.)

In *People* v. *Bowlby,* 135 Cal.App.2d 519 [287 P.2d 547, 53 A.L.R.2d 1147], the acts in question were held to be sufficient because the procedures followed a well-established pattern of conduct.

The particular acts involved in this case are, as heretofore said, consistent with an ordinary vaginal examination to determine the condition of Mrs. Frank. It is not established

that defendant believed Mrs. Frank was pregnant. Nor is it established that the doctor relied upon what a prospective patient told him with reference to pregnancy. In fact, he repeatedly told Mrs. Gresham that she was not pregnant in spite of her protestations to the contrary. There is no evidence that defendant was regularly engaged in performing abortions according to any prescribed pattern or procedure. Under the peculiar facts and circumstances of this case, we cannot agree that each of the elements of the crime were established beyond a reasonable doubt.

■ With respect to defendant's contention that the court erred in failing to give the defendant's requested instruction on the defense of entrapment, we think the issue should have been submitted to the jury. ■ Such an instruction was refused in *People* v. *Cummings*, 141 Cal.App.2d 193 [296 P.2d 610], on the basis that no substantial evidence of entrapment had been presented, the court stating the rule (at p. 201) to be as follows: "While it is well settled that a defendant is entitled to instructions based on the theory of his defense, the court may refuse proffered instructions on a theory that is not supported by substantial evidence."

■ The evidence before us insofar as the defense of entrapment is concerned is closely analogous to that presented in *People* v. *Reed*, 128 Cal.App.2d 499 [275 P.2d 633], wherein a conviction was reversed because no instruction on entrapment was given, the court stating (at page 502), "it was the duty of the court to instruct the jury on the doctrine of entrapment. (*People* v. *Alamillo*, 113 Cal.App.2d 617 [248 P.2d 421]; *People* v. *Gallagher*, 107 Cal.App. 425 [290 P. 504].) Entrapment was an issue as to that count. It was, of course, for the consideration and determination of the jury. But it was the right of defendant to have the jury so instructed."

From the evidence in this case it could easily be believed by the jury that the criminal design was hatched or conceived in the minds of the state officers, and that Alice Frank was used as the decoy to ensnare the doctor into the alleged crime; that the doctor never did intend to abort her and that he was only in the course of doing that which was professionally proper.

Admittedly, Mrs. Frank did not go to the doctor to have an abortion committed, she was not pregnant; she went there with the preconceived idea of telling admitted untruths, and then of decoying the doctor into examining her. It must be

admitted that what the doctor did thereafter is entirely and wholly consistent with good medical practice, and but for some intent to commit a crime, would not in any sense be violative of any criminal abortion law. The overt acts, that is, what was actually done, seem to be admitted. The question is, for what purpose were the acts done? If the procedure was to the end that the doctor could determine what the condition of the woman was, and thereby make a diagnosis, a crime was not committed.

 Lastly, the matter of the so-called confession of the defendant should be considered. We realize that the defendant's counsel did little, if anything, about presenting the law of admissions and confessions to the court, and did practically nothing toward examining the witnesses on *voir dire* to ascertain if the statements were freely and voluntarily made, or made so as to be admissible. However, this case may be retried and we believe comments thereon are presently proper. It is admitted that the investigator pulled out a gun from his pocket and "dangled" it in his left hand, and then instructed or directed the doctor what next to do. Presumably, the doctor thought of the possibilities of getting shot and then complied with the investigator's instructions. Shortly thereafter the "statement" was taken on a tape recorder. In fact, apparently two statements were taken, as heretofore indicated, the first of which was recorded, and then for some reason of the investigator's, was found not to be to his full liking and a second statement was taken on the same machine, the second statement being such that it mechanically erased the first statement.

In other words, the question is presented: did the defendant, under the circumstances, exercise "mental freedom" in the making of his statements—was it an expression of free choice?

 It has been held that the "slightest pressure, whether by way of inducement to confess, or threat if confession is withheld, is sufficient to require the exclusion of the confession." (See *People* v. *Siemsen,* 153 Cal. 387, 394 [95 P. 863], cited with approval in *People* v. *Berve,* 51 Cal.2d 286 [332 P.2d 97]. The court in the Berve case said (p. 291.): "The prosecution must show that such coercive conditions as once existed, no longer prevailed at the time the confession was uttered. (Citing cases.)"

Paraphrasing a statement in *People* v. *Shaw,* 111 Cal. 171, 174 [43 P. 593]: Criminal cases too often are conducted upon the preconceived theory that the defendant is guilty,

and that if given a fair trial, according to the established rules, the jury may not convict him. The purpose of a criminal trial is to discover and determine whether a defendant is guilty or not guilty; not merely to maintain at all hazards, a theory of guilt entertained beforehand by any one man or any group or community of men.

The judgment and the order denying defendant's motion for a new trial are, and each is reversed.

White, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied March 11, 1959, and respondent's petition for a hearing by the Supreme Court was denied April 8, 1959. Shenk, J., and Spence, J., were of the opinion that the petition should be granted.