[Crim. No. 6396.   Second Dist., Div. Three.   Oct. 19, 1959.]

THE PEOPLE, Respondent, v. EMANUEL VAN DYKE FEIGIN, Appellant.

Milton L. Most and Erich Auerbach for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SHINN, P. J.—By information, Emanuel Van Dyke Feigin was charged in Count I with committing an abortion upon Jeanne Kavalec and in Count II with committing an abortion upon Margarita Castaneda. In a court trial, Feigin was found guilty of both offenses and probation was granted on condition that he pay a fine of $2,500 on Count I and $5,000 on

Count II. Feigin appeals from the judgment and the denial of his motion for new trial.

There was evidence of the following facts. Appellant is a licensed physician, specializing in internal medicine and in the treatment of cardiovascular diseases. He maintains one office in the Lakewood Medical Center and a second office in his home in Westchester.

Carlos Rios was the principal witness for the People on Count II. The following is the substance of his testimony. He took Margarita Castaneda to appellant's home office on December 12, 1956. He informed the doctor that Miss Castaneda was pregnant and that "we wanted to get rid of it" and Feigin said that would be all right with him. An appointment was made for the following Friday, December 17th. Appellant told Rios that his fee would be $300 and he gave the witness a prescription for Margarita, stating that the medicine was to combat infection after "he had taken it out." Margarita took no part in the negotiations because she did not speak English.

Rios and Miss Castaneda returned to the doctor's home early in the evening of the 17th. Feigin gave Margarita an injection in the arm and told Rios to wait outside with her until the injection took effect. Rios gave appellant $300 in cash and went outside with Margarita. After about 45 minutes, they reentered the office. At the doctor's request, Miss Castaneda removed her underclothing and got up on an examining table. Her feet were placed in stirrups on either side of the table and she was given a second injection, after which she became semiconscious. Rios remained in the room. We need not relate Rios' description of appellants' subsequent actions. If believed by the court and corroborated by independent evidence, his testimony was sufficient to establish the commission of an abortion upon Miss Cantaneda. After completing the operation, Feigin told Rios to have Margarita take the medicine he had previously prescribed for her and to have her return in a week for an examination. (It was established that a prescription for gantrisin, a drug used to combat infection, was issued to one M. Castaneda by Dr. Feigin and was filled on December 16th.) Rios accompanied Miss Castaneda to the doctor's office a week later but did not talk to appellant.

Miss Castaneda testified with the aid of an interpreter that she believed herself to be pregnant in December 1956 and had informed Rios of her belief. Aside from her preg-

nancy, she was in good health. She went to the doctor's office "because Carlos took me there." She did not understand any of the conversation on her first visit. On her second visit, the doctor gave her an injection. After a second injection administered while she was lying on a table, she lost consciousness and did not awaken until after she had returned home. She went to the doctor's office the following week and the doctor examined her private parts. About a month later, she resumed her menstrual periods.

As we have said, appellant was charged in Count I with committing an abortion upon Jeanne Kavalec. Jeanne testified that in October 1957 she believed herself to be pregnant although in other respects she was in good health. Around October 1st, she consulted a Dr. Sacks and gave him a specimen; she heard from Sacks about three days later. October 11th, she contacted appellant and made an appointment to see him the following day. Her sister, Joane Megroz, accompanied her to Feigin's home office. Jeanne told appellant that she had had a pregnancy test and believed she was pregnant. A fee of $300 was discussed. Jeanne gave Feigin $148 in cash and a $150 check of a construction company made payable to her. At the doctor's request, she removed her underclothing, got on an examining table, placed her feet in stirrups and underwent an abortion; the operation lasted between three and five minutes. Appellant then gave her some pills and told her not to have intercourse for several weeks as she was susceptible to becoming pregnant. Her sister drove her home.

The next day Jeanne became ill and the day afterward consulted a Dr. Whitehead who made a pelvic examination. Three days later she was admitted to the Good Samaritan Hospital where she was treated by Dr. Whitehead.

A few days after leaving the hospital, Jeanne went to appellant's office in the company of a Sergeant Galindo, who posed as her boy friend. Galindo waited in the outer office while Jeanne talked to appellant. When asked what she wanted, Jeanne told Feigin that she had been in the hospital and wanted to be compensated for her hospital expenses as he had not treated her properly. She asked for reimbursement of a $65 deposit she paid upon her admission to the hospital . Feigin gave her the $65 and told her to bring in the rest of her hospital bills and he would pay them. Appellant asked her for a receipt indicating that the $65 was

a refund for an overpayment and after considerable discussion, Jeanne signed the receipt.

A week later Jeanne telephoned appellant and told him she had the hospital bills. Several days later she went to see appellant in the company of a Mr. Gerson. On this occasion Feigin gave her $130 or $135 in cash. She resumed her normal menstrual periods in November.

Dr. Irving Sacks, a physician and surgeon, testified that he saw Jeanne on September 30th. She told him that she had missed two menstrual periods. After an inconclusive pelvic examination he saw her the next day and obtained a specimen for analysis at a chemical laboratory; he received a laboratory report indicating that she was pregnant and he informed her of the results of the test. The witness also testified that when he examined Jeanne he observed a leukorrheal discharge and a swelling near the upper left labia; both conditions might possibly have been due to a mild infection not associated with venereal disease. In the doctor's opinion the swelling and the discharge could have delayed the menstrual period.

As mentioned earlier, Jeanne consulted a Dr. Whitehead two days after her first visit to appellant. Whitehead testified that when he examined her on October 14th he noticed an enlargement of the cervix and uterus and a brownish discharge; in his opinion, based upon the examination and the history given by Jeanne, she was in a post-abortive condition. Two days later he reexamined her, as she had bled and passed a piece of tissue; he observed a substance which he thought might be placental tissue. Jeanne was hospitalized October 18th because of continued bleeding. Dr. Whitehead performed a curettement in order to remove tissue remaining in the uterus.

The People also offered the testimony of Jeanne's sister, Joane Megroz, who, as we have said, accompanied Jeanne when she first went to appellant's office. Miss Megroz testified that when Jeanne left the office she looked frightened and pale. Jeanne had previously told her that she was pregnant and that she was going to Dr. Feigin to have an abortion.

Sergeant Danny Galindo, a Los Angeles police officer who specializes in abortion investigations, recounted his visit with Jeanne to appellant's home on October 24th. When Jeanne told him that she had obtained the $65 from appellant, he mentioned to Feigin that he had invested $300 in her health and thought she should at least receive enough money to meet her hospital bills. Jeanne said that the doctor whom she con-

sulted had informed her that appellant had done a bad job and Feigin rebutted the assertion of his incompetence. Galindo then told appellant that he had telephoned Jeanne's doctor and the doctor had said that he did not believe there was a "D and C" (dilation and curettement) done. Appellant replied: "Well, that isn't the case at all. There was a D and C done."

Dr. Feigin testified at length in his own behalf. He had previously treated Rios for a venereal disease (which Rios denied in his testimony). Rios and Margarita came to his home in December 1956 and the former told him that Miss Castaneda complained of pelvic and abdominal discomfort, had previously suffered from burning urination and a thick yellowish vaginal discharge and that she had missed her menstrual period. Appellant's impression was that Margarita had a venereal disease and he gave her a prescription for gantrisin. When Margarita and Rios returned to his office on December 17th, appellant made a pelvic examination of Miss Castaneda in the absence of Rios; he discovered what he thought was a venereal infection, gave her some penicillin and sulfa tablets and told her to return within a week for a check-up. He did not perform an abortion. When she returned with Rios the following week her condition appeared to be corrected. Appellant charged a $30 fee which was never paid.

Feigin testified further that on Jeanne Kavalec's first visit to his office she complained of vaginal bleeding and cramps. She mentioned her visits to Dr. Sacks and the results of her pregnancy test. Appellant examined her and found some internal bleeding and pieces of friable tissue in the cervix. On the basis of his examination he diagnosed her condition as a vaginal infection, a mild cervicitis and a probable miscarriage and he gave her some medicine. He charged her $10 for his treatment, cashing a $150 check for her and retaining the amount of his fee. He advised her to come back for a check-up but she did not do so. Jeanne returned on October 22d and asked him for $65, claiming he had shortchanged her and that she had to have a curettement in the hospital. Appellant then telephoned Dr. Whitehead and learned of Jeanne's hospitalization. He consulted his brother, a practicing attorney, who advised him that it would be wiser to reimburse Jeanne than to face the embarrassment of possible insurance claims and lawsuits. When Jeanne came to his office with Galindo on the 24th, Feigin said he would give

her the $65 if she would sign a receipt, which she did. He denied performing an abortion on Jeanne and denied having said so to Galindo. In his opinion, an abortion could not be performed in less than 15 to 20 minutes. After repeated threats of prosecution from Jeanne appellant gave her an additional $160. He did not obtain a release from Jeanne after giving her the $65 and he did not report her threats to the police.

A number of witnesses testified to appellant's excellent reputation in the community for truth, honesty and ethical conduct as a physician.

Sergeant Galindo testified in rebuttal that he searched through appellant's filing cabinets at the time of his arrest and found no cards or case histories relating to Jeanne or Margarita. Feigin had testified that he kept records of both women.

With respect to Count II, the first contention that requires decision is that there was insufficient evidence to support the conviction in that there was no evidence of a substantial nature corroborative of the testimony of Rios. This contention must be sustained.

According to the testimony of Rios he arranged with defendant for Margarita's abortion, paid defendant $300 and assisted him as previously described. He was a confessed accomplice. (*People* v. *Wilson*, 25 Cal.2d 341, 346 [153 P.2d 720].) Without corroboration his testimony was legally insufficient to prove commission of the offense. (Pen. Code, § 1111.)

The People contend that the evidence of Margarita furnished sufficient corroboration, but we cannot agree. The salient facts of her testimony were that she believed herself to be pregnant; she went to defendant at the request of Rios but not for the purpose of having an abortion performed; on the first visit she was given an injection; on the second visit she was given two injections, was placed upon an operating table, prepared for an examination and became unconscious. She had no knowledge of the subsequent actions of defendant; she did not regain consciousness until she returned home; about a month later her menstrual periods were resumed.

For the purpose of corroboration her testimony was to be examined independently of and without taking meaning from the testimony of Rios. The test of its sufficiency is whether when so examined it directly connected defendant with the commission of the offense so as to convince the trier

of fact that Rios was telling the truth. (*People* v. *MacEwing*, 45 Cal.2d 218 [288 P.2d 257].) ▮ It is apparent that Margarita testified to no action of defendant which, considered separately from his actions testified to by Rios, constituted in whole or in part a violation of law.

▮ It is well established that "the corroborative evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense." (*People* v. *Gallardo*, 41 Cal.2d 57, 63 [257 P.2d 29].) The elements of the offense were the use of instruments and the intent thereby to produce a miscarriage. **[1d]** Margarita testified that she did not want to do anything about her pregnancy; she went to defendant because Rios asked her to; she told defendant nothing, did not hear Rios tell him anything and she saw no money pass to defendant. Merely placing her upon a table in a position for a vaginal examination did not constitute an element of abortion or attempted abortion. (*People* v. *Holbrook*, 45 Cal.2d 228 [288 P.2d 1].) Margarita did not state her reason for believing herself to be pregnant, although she did testify that her periods were resumed a month later. Evidence that a woman who believed herself to be pregnant was given a vaginal examination and a month later menstruated does not tend to prove that the physician who examined her had committed an abortion. Something more is required to place the physician under suspicion of criminal activity and even then suspicion, even grave suspicion, that an abortion was performed has invariably been held insufficient to prove commission of the offense. (*People* v. *Crain*, 102 Cal.App.2d 566, 578-581 [228 P.2d 307]; *People* v. *Murphy*, 60 Cal.App.2d 762 [141 P.2d 755]; *People* v. *Gilbert*, 30 Cal.App.2d 321 [86 P.2d 135].) We conclude that the testimony of Margarita did not furnish legal corroboration for that of Rios.

▮ The People contend that the testimony of Jeanne Kavalec considered with that of Margarita furnished corroboration of the testimony of Rios. ▮ They invoke the rule that corroboration of evidence of the commission of one abortion may be furnished by evidence of the commission of one or more other abortions providing the evidence proves that the accused used substantially the same methods and procedure in each case. (*People* v. *Davis*, 43 Cal.2d 661 [276 P.2d 801].) ▮ It is a well established rule but it has no application to the facts of the instant case. As we shall presently develop there was sufficient proof of the commission of an abortion

upon Jeanne but that is of no significance in view of the fact that the evidence failed to establish the commission of the offense upon Margarita. Manifestly it is only where the commission of two or more offenses is proved that evidence of pursuit of a common plan and procedure can be shown. The attorney general compares the methods of defendant as described by Jeanne with the methods described by Rios but this comparison is of no significance in view of the failure of the proof to establish the commission of an abortion upon Margarita. An additional reason for rejecting this argument of the attorney general is that the testimony of Rios was to be disregarded in the absence of corroboration. If the evidence had proved an abortion committed upon Margarita by means of her testimony in corroboration of that of Rios, the methods of defendant as described by Jeanne could have been compared with those described by Rios as evidence of the use of similar methods, but in the absence of such corroboration the testimony of Rios was incompetent as proof of any material fact to which he testified. For the foregoing reasons the conviction under Count II must be reversed.

With respect to Count I it is contended that it was not shown that defendant believed Jeanne to be pregnant, therefore, he could have had no intention to perform an abortion and it is contended further that the People failed to produce adequate evidence that any abortion or treatment performed by defendant was not necessary to preserve life within the meaning of the exception contained in Penal Code, section 274.

There was in our opinion ample evidence to warrant the court in finding that defendant believed Jeanne to be pregnant. She testified that she told him that she believed herself to be pregnant and that Dr. Sacks had had a test made for pregnancy which was positive and that he had advised her of that fact. Defendant testified that Jeanne did tell him of her belief respecting her condition, that she had also told him of the examination by Dr. Sacks and the results of the test he had made. Defendant made no examination and had no test made to determine whether Jeanne was pregnant. It is true that he testified he observed conditions which would indicate that she was not pregnant but he did not testify that he advised her to that effect. The fact that she went to him and informed him that she was pregnant was a circumstance which clearly indicated that she sought his help for that reason and for no other. The information which defendant admittedly received from Jeanne with respect to her history,

the examination by Dr. Sacks and the test that was then made was sufficient to warrant the court in finding that defendant had cause to believe and did believe that Jeanne was pregnant. Manifestly, the court did so find. If the court had believed that Jeanne's condition was as described by defendant, namely, that his examination disclosed that she was not pregnant, he would have been acquitted.

It is contended that in any event the evidence was insufficient to prove that defendant committed any unlawful act in that there was no sufficient corroboration of Jeanne's testimony with respect to the commission of any element of the offense. We regard this contention as untenable. A reasonable inference from the testimony of Dr. Sacks would be that the facts disclosed by his examination and the test that was made indicated that Jeanne was pregnant and was not in the condition described by defendant when she visited him 12 days after the examination by Dr. Sacks. The conditions disclosed by Dr. Whitehead's examination, the first two days and the second four days after Jeanne's visit to defendant, and those discovered two days later during the operation he performed in the hospital furnished potent evidence that at the time of those examinations Jeanne's condition was not at all the same as it was when she was examined by Dr. Sacks. Dr. Whitehead diagnosed her condition as a post-abortion condition. He testified that his first examination which was based largely upon the history given to him by Jeanne was later confirmed by his physical findings. This evidence as to the change that had taken place in her condition in the meantime clearly indicated that she had been relieved of her pregnancy and was a circumstance which tended to corroborate her testimony as to the manner in which defendant operated upon her. Additional corroboration is found in the testimony of Sergeant Galindo. He testified that when he went with Jeanne at the time she demanded money from defendant he stated to defendant that Jeanne had been advised that defendant had not performed a D and C (dilation and curettement) and that defendant replied that he had done so. Galindo testified further that he told defendant at that time he had furnished Jeanne with $300. Defendant testified that Galindo said he had furnished Jeanne with the $300 which she claimed to have paid him but that he did not then or at any time admit that he had received $300 from Jeanne.

Jeanne's testimony that she paid defendant $300 of which $150 was by endorsement of a check in that amount was cor-

roborated to some extent by defendant's admission that he received the check. His explanation was that he gave her $140 in cash and retained $10 for his services. If the court had found that defendant received only $10 for his services the entire testimony of Jeanne should have been rejected. If the court believed, and the judgment implies that the court did believe, that defendant received $150 or more for his services, the court must have concluded that his testimony that he gave Jeanne only superficial local treatment for a fee of $10 was sufficient to destroy his credibility and to warrant the rejection of his denial of criminal actions.

Defendant gave about $200 to Jeanne upon the advice of his brother who is an attorney but we do not regard the reimbursement of Jeanne as necessarily indicating a consciousness of guilt on the part of defendant. However, it was a question for the trier of fact to weigh the evidence respecting the payments to Jeanne and to determine whether accession to her demands indicated a consciousness of guilt. It is clear to us that the testimony of Jeanne was corroborated in a manner to reasonably convince a trier of fact that she had testified to the truth, although there was no direct evidence corroborative of her testimony that defendant used instruments upon her. Jeanne's testimony having been corroborated in material respects by independent evidence was to be considered with all the other evidence in the case. (*People* v. *MacEwing*, 155 Cal. App.2d 117 [317 P.2d 82].) When thus considered, her testimony that defendant used instruments upon her for the purpose of producing an abortion was sufficient proof of that fact.

The next contention is that since inducing a miscarriage is not a crime if it is necessary to preserve life (Pen. Code, § 274) and it was incumbent upon the People to prove there was no such necessity in Jeanne's case (*People* v. *Gallardo, supra*, 41 Cal.2d 57), there was a failure of proof due to the insufficiency of evidence to negative the exception. Realizing that the question is ordinarily a factual one, defendant contends that it was established as a matter of law that an abortion was necessary to preserve Jeanne's life, that is to say, that the court's determination of nonnecessity has no support in the evidence. The argument upon this point is unconvincing. Defendant relies upon the case of *People* v. *Ballard*, 167 Cal.App.2d 803 [335 P.2d 204], in which the accused physician produced a miscarriage under circumstances which made it necessary to relieve his patient of her

condition in order to preserve her life. The holding cannot be applied to the facts of the present case. Jeanne testified that when she went to Dr. Sacks she was in good health except for her pregnancy. The testimony was substantially, if not literally true. Dr. Sacks found that she had a leukorrheal discharge, which he described as a common condition due to irritation and unassociated with venereal disease. He also found some swelling near the upper left labia which might or might not have been due to a mild infection. Defendant does not contend that the condition described by Dr. Sacks endangered Jeanne's life. He enumerates the symptoms that developed after his own treatment, as she described them, and he emphasizes the conditions which occasioned the operation by Dr. Whitehead, contending that they were consistent with his own findings as he described them. But the later conditions have no significance apart from defendant's own testimony that they existed at the time Jeanne came to him. Dr. Sacks did not suggest an operation or find any alarming condition. Defendant says in his brief there was no support for a finding that he intended to commit a criminal abortion but ''To the contrary, the record shows that defendant had no belief that Jeanne was pregnant or that an abortion was necessary.'' In our examination of the evidence of the People we have found only evidence that Jeanne was in good health except for trivial ailments at the time she consulted defendant. Considered by itself this evidence was sufficient to disprove necessity for an operation to preserve her life. (*People* v. *Gallardo, supra,* 41 Cal.2d 57.) But when the court came to decide that question it had for consideration not only the evidence of the People but also the testimony of defendant. There was, as we say, no inadequacy of the evidence of the People. It could have been overcome, however, by evidence of defendant such as that produced in the Ballard case, but his own testimony, if believed, disproved existence of a necessity to produce a miscarriage in order to preserve Jeanne's life.

Upon a showing that the reporter's transcript contained many inaccuracies we ordered it returned to the trial court for reexamination and such correction as the court should find necessary. A hearing was had which lasted two full days. Defendant specified many particulars in which inaccuracy was asserted. The reporter was present with his notes throughout the hearing. He had compared his notes with the transcript in its entirety. The trial judge had taken extensive notes as had others who had attended the trial. In numerous

instances the reporter voluntarily disclosed discrepancies between his notes and the transcript and corrections in the transcript were duly made. Each item of claimed error was considered separately, resort being had to the reporter's notes and the notes of the judge and others taken at the trial. Frequently when a mutual understanding was not reached defendant was permitted to state his own recollection as to the testimony that had been given and in each instance, save one, which was of no importance, the version of defendant was accepted. Throughout the hearing every doubt was resolved in favor of defendant. The original transcript contained 299 pages; the supplemental transcript of the proceedings for correction contains 228 pages.

At the outset of the hearing defendant made a motion that the reporter's notes be impounded and examined by a reporter of his own choice. The motion was denied without prejudice and was renewed at the close of the hearing, when it was denied. These rulings are assigned as error and it is contended that the record on appeal is so defective as to amount to a deprivation of the right of appeal and due process. We cannot agree with either contention. The reporter has had many years of experience in court work. He was shown to be a competent reporter. There were many errors in the transcript but nearly all of them were errors in transcription. The reporter had difficulty in making sense out of some of the passages in his notes. There was a good deal of medical testimony and, as the court recalled, defendant spoke with great rapidity. It is not possible for even the most competent reporter to take down every word uttered by every witness; some speak indistinctly, others too rapidly. In such instances it is far better that the witness be kept under control than for the reporter to attempt the impossible. It is not necessary, however, that the reporting be letter perfect, so long as it is accurate as to a degree that fully and fairly serves its purpose. There was no necessity for the examination of the notes of the reporter by another reporter. It is an erroneous and unwarranted assumption that any other reporter could have read the notes better than or as well as the reporter who made them. It was not shown in the hearing that the reporter was incompetent. It was shown that he had been careless in the transcription of his notes. Fortunately, no serious harm has resulted.

We have read the transcript of the proceedings for correction of the transcript and are persuaded that the rights

of defendant were scrupulously protected. In fact, the errors that were found, even if they had not been corrected, would not have had any bearing whatever upon the questions of law that are presented on the appeal. Instead of characterizing the court's action in refusing to use the services of another reporter as arbitrary, the briefs of defendant might well have conceded that the trial court took extreme measures and exercised the utmost fairness, and even generosity, to defendant, in perfecting a record of the oral proceedings.

Defendant made a motion for a new trial supported by his affidavit that new evidence had been discovered consisting of a complete pathological examination and diagnosis made by Dr. Raymond Bangle, Jr., of tissue which had been submitted by Dr. Whitehead at the time of his operation upon Jeanne Kavalec. Upon the hearing, Dr. Bangle testified that he was a pathologist connected with the Good Samaritan Hospital; specimens of tissue removed by Dr. Whitehead had been submitted to him at the time of the operation and he had furnished a report of the results of his examination. His findings were contrary to those of Dr. Whitehead; he discovered no placental tissue or fetal parts. In his opinion the results of his tests ruled out pregnancy and the existence in the patient of conditions following an incomplete abortion at the time of Dr. Whitehead's operation.

Error is assigned in the court's consideration of the significance of Dr. Bangle's testimony. It is contended that the court's remarks in the discussion of the medical testimony confused the evidence in Jeanne's case with that in Margarita's case and that the court failed to give Dr. Bangle's testimony the weight to which it was entitled as contradictory of Dr. Whitehead's findings. It is urged that if the judgment is not reversed the order denying motion for a new trial should be reversed and the cause remanded for a reconsideration of the motion. We find the contention to be untenable. It is true that in ruling upon the motion some statements of the court disclosed a misconception of defendant's testimony respecting his examination and treatment of Jeanne. The court stated that defendant had testified that he found Jeanne suffering from a venereal disease, thus confusing her case with the case of Margarita. And we find the court gratuitously criticizing defendant for failure to use the methods of treatment of venereal disease which the court described and stated to be the customary and proper methods. These remarks were wholly irrelevant to a consideration of

the weight and effect to be given to Dr. Bangle's testimony. But defendant has quoted only a portion of the court's statements. Considered as a whole they clearly show that the court was convinced that defendant believed Jeanne to be pregnant and that he operated upon her for the purpose of producing an abortion. Being convinced of those facts, the court deemed it immaterial whether Jeanne was in fact pregnant. Dr. Bangle's testimony would have served to corroborate the testimony of defendant that he did not find Jeanne to be pregnant but it is apparent that if Dr. Bangle's opinion had been given full credit it would not have altered the court's conclusion that defendant believed Jeanne to be pregnant. Operating for the purpose of producing a miscarriage would constitute the offense charged even though it was not proved that Jeanne was in fact pregnant. (*People* v. *Gallardo, supra,* 41 Cal.2d 57.) There was no error in denying the motion for a new trial.

The judgment and the order denying the motion for new trial with respect to Count II are reversed; the judgment and the order denying the motion for new trial as to Count I are affirmed.

Wood (Parker), J., concurred.

A petition for a rehearing was denied November 16, 1959, and appellant's petition for a hearing by the Supreme Court was denied December 16, 1959.