[Crim. No. 7255. Second Dist., Div. Two. Jan. 23, 1961.]

THE PEOPLE, Respondent, v. ALFRED PALMER REED, Appellant.

Abraham Gorenfeld for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

KINCAID, J. pro tem.*—Alfred Palmer Reed, appellant, a medical doctor, was charged by information in one count with conspiracy to commit abortions in violation of sections 182 and 274, Penal Code, and in four counts with abortion in violation of section 274, Penal Code.

Count I charged that Reed and Gloria Lancaster, from

---

*Assigned by Chairman of Judicial Council.

October 8, 1956, to July 3, 1958, unlawfully conspired and agreed together and with other persons to wilfully and feloniously commit abortion. Eleven overt acts were charged for the purpose of carrying out the conspiracy.

Count II alleges that Reed and Lancaster, on or about May 23, 1958, did provide and use an instrument and other means upon the person of Sunnie Belle Smith, a woman, with wilful and felonious intent to procure a miscarriage of her, such action not then being necessary to preserve her life.

Counts III, IV and V charged similar acts on persons of three other women as were charged in count II.

After waiver of trial by jury the case was submitted on transcripts of the preliminary hearing with each side reserving the right to put on additional evidence. Overt acts one through eight were stricken and counts III, IV and V relating to the three other women were dismissed. Lancaster was found not guilty as to the remaining two counts and Reed was found guilty of both count I and count II. Appeal is from the judgment (order granting probation) and the order denying appellant's motion for a new trial.

Viewing the evidence in the light most favorable to the People, as we must do following a guilty verdict (*People* v. *Caritativo,* 46 Cal.2d 68, 70 [292 P.2d 513] ; *People* v. *Sweeney,* 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]) it is disclosed that at the beginning of 1958 Sunnie Belle Smith was experiencing normal monthly menstrual periods. In March or April of that year her menstrual periods discontinued. At that time she contemplated an abortion. She went to Hugh Corrigan and complained that she had missed her menstrual period. About May 20, 1958, Corrigan made a phone call and talked with a person who identified herself as "Gloria." He told her that Sunnie was in trouble, that he was given her phone number and told that she could "fix him up." Gloria told him that she couldn't find out whether it would be done on a Thursday or a Friday so that Corrigan had to call her back. When Corrigan again called Gloria she told him that they should meet her at a certain drive-in restaurant, Friday night, May 23, at 8:30 p. m. Gloria told him it would cost $400.

On May 23, 1958, Corrigan drove Sunnie to said drive-in at the time arranged. About 9 p. m. Gloria met them for the purpose of taking Sunnie some place to have an abortion performed. She explained she was late because her car had broken down. At that time Sunnie's menstrual periods had

been stopped for two and one-half months. Gloria said that Corrigan would have to drive them to Dr. Reed's office where an appointment had been made for that evening. She got into the car. Gloria said that she had to call Dr. Reed to see if it was too late and if he had waited for them. They stopped and she got out and made the phone call. After that Corrigan drove them to a location east of Main Street on Vernon Avenue, Los Angeles, and parked in the rear of the building. Gloria said, "Oh, who has the money?" Corrigan gave her $400 in cash. She said, "The doctor will let us know when it is time to go up." They sat in the car for 15 minutes, then she said, "It is time to go." Sunnie and then Gloria got out of the car and went into a medical office located at the top of one flight of stairs which was outside of the building. Corrigan drove away as Gloria told him it would be an hour or so. (Overt act No. 9.)

Sunnie identified the back of the building located at 1111 East Vernon Avenue, Los Angeles, depicted in a photograph (People's Ex. No. 2-F), as resembling the one which contained the doctor's office, except as to the appearance of the outside stairway. She identified the office depicted in People's Exhibit Number 2-C as the office where that night she had seen and talked to the doctor. She stated that People's Exhibit Number 2-B looked like the room into which she went with the doctor and Exhibit Number 2-D could represent the examination room she was in that night. Corrigan identified People's Exhibit Number 2-F as representing the back of the building at which he parked that night and People's Exhibit Number 2-G as portraying the driveway of that building.

Sunnie described the doctor as being a tall, slender-built, colored man. Other than her pregnancy, she was in good health. She had a conversation with the doctor. They discussed her condition and he told her to take off her clothes and get on the table, which she did. She got on the table, put her feet in the stirrups and a sheet was placed across her. Gloria had accompanied Sunnie into the examination room and assisted her in holding a mask on her face. She was told by both the doctor and Gloria to hold it around her nose and mouth and to breathe deeply. Sunnie lost consciousness and when she awoke, Gloria and the doctor were in the room. The doctor told her to get dressed and handed her a sanitary napkin. He said that she should be all right, should have a menstrual period in about a month and should have a slight discharge for a few days. After May 23, 1958, Sunnie had a

slight discharge and her normal menstrual periods resumed. She has never had a child since that date. (Overt act No. 10.)

Meanwhile, Corrigan had returned to the parking lot and fallen asleep. Sunnie walked out the back stairs and got into the car with him. He was awakened by the door opening and the light coming on. Gloria accompanied her to the car but did not leave with them, stating that the doctor would drive her home. Sunnie had gone into the doctor's office about 10 o'clock in the evening and left, rejoining Corrigan about 1:30 in the morning.

Aldo Santoni testified that he had known appellant Reed since the latter part of 1954. About November of 1957, he took a female friend of his to appellant's office for the purpose of having an abortion. Reed and Santoni had previously discussed the problem of abortion being illegal in the United States though legal in other countries. They also discussed the fees for abortions. They discussed a fee of about $500. They discussed the fact that Santoni's female friend was in trouble and her desire for an abortion. An appointment was made and Santoni brought this girl to Reed at his office. The appointment was for 8 o'clock in the evening. There were no nurses or anyone else present. Santoni waited for the girl for approximately 45 minutes. Reed then said, "Everything is fine," and paid Santoni $75 for having brought her to him, as had been previously arranged.

Santoni further testified that in July of 1958, he received a telephone call from Mike Pataki. Pataki told him that a school girl whose parents were in the east wanted an abortion. Santoni told Pataki he would call him back. Santoni then called Reed and told him that there was a young girl in trouble whose parents were back east. Reed said, "Call me back." When Santoni called him back at 6 p. m. Reed said, "Well, see me Wednesday at 8:00 . . . Call me a half hour before you come." Santoni called Pataki and told him that everything looked like it would be all right and arranged with him to meet at a certain drive-in restaurant.

On July 2, 1958, Deputy Sheriff James E. Wahlke learned that arrangements had been made by a man to take a pregnant girl to a place for an abortion on the night of Friday, July 3. The man and girl were to be picked up at a certain restaurant parking lot at approximately 6:30 p. m. and were to have $400 in cash with them. Deputy Wahlke also learned that the pregnant girl was 17 years of age. He went to her home and talked to her in the presence of her mother, at which time the mother first became aware of her daughter's condition. Wahlke in-

structed the girl that if any phone calls were received at her house regarding this abortion, she was to indicate that she was going to go ahead with it. Wahlke and his superior determined that he and Deputy Joan Miller would keep the appointment at the said parking lot in place of the girl and her man friend.

Deputies Wahlke and Miller went to said parking lot at 6:30 p. m. on July 3. At approximately 6:50 p. m. Al Santoni came up to them and asked, ''Is this Lee Turner?'' Deputy Miller said, ''Yes.'' Santoni asked them why they were in that parking lot when they were supposed to be in another named parking lot. Wahlke said that they had been told to be in this particular parking lot. He told Santoni he had $400 and asked him if he wanted it at that time. Santoni said, ''No,'' and that $500 had been agreed upon, but nevertheless he said $400 would be all right. Santoni said he was going to take the girl for the abortion but that Wahlke would have to stay at the parking lot. He would be back in about two hours. Wahlke said the girl was nervous and Santoni agreed to let him go along with them. Wahlke was driving a small car so they decided to use Santoni's car with more room in it. As they drove, Miller said that she was scared to have an abortion as she had never had one before. Santoni said that he was taking them to a doctor and that there need be no fear as there was no danger. He said that he had taken other girls to the doctor before. He said, ''There's just nothing to it.'' She asked him what type of abortion it was going to be, if he was going to do something to her and later she would lose the baby. Santoni said, ''No,'' and that it would all be taken care of at that time.

Wahlke asked Santoni who the doctor was. Santoni said, ''He is a regular doctor.'' Wahlke asked him whether he was an M. D. or a D. O. and Santoni said that he was an M. D. He said that the doctor was a mulatto and a very good doctor. He said he had even taken his sister to the doctor for an abortion. Wahlke asked Santoni what type of abortion the doctor performed. Santoni told him he performed a ''D and C'' (dilation and curettement). Wahlke asked Santoni if the doctor used a method by which a catheter was employed, not using the word ''catheter,'' however. Santoni said no, but that he did a real good job, and that there was no danger. Miller asked if it would hurt and if she would be put out when it was being done. Santoni said no, that there was no pain to it whatsoever, and that if she wanted to, she could go dancing

that same evening; that when he brought his sister over there and had the abortion, she had gone out dancing that night. Santoni said he had taken several girls over there and none of them had ever had any complications.

Santoni left the deputies and telephoned Reed who said "Call me back." This was about 7:30 p. m. He returned to the deputies and said they would have to wait awhile. Later Santoni again telephoned Reed who said to call him from a certain gas station. Santoni went back to the deputies and said that the doctor had a patient in his office but they could start over slowly. At 7:55 they made a stop at a gas station on the corner of Vernon Avenue approximately two blocks from appellant's office. Santoni got out and telephoned to Reed who asked what type of car they were driving and said, "Come on up." Santoni returned to the car and went under an archway, and pulled into the parking lot in the rear of the building, where they parked the car.

Santoni asked Wahlke for the money and the deputy paid him $400 in cash. Santoni then said that Wahlke would have to remain in the car and that Miller would have to accompany him by herself. Miller acted nervous and started to cry, saying that she wanted Wahlke with her. Santoni said, "Well, come on up then." The three of them went up and entered Reed's office. Santoni opened the door with a key that he had in his possession. There were no nurses or others there at the time. Wahlke and Miller seated themselves in the waiting room while Santoni went on back through a hall and spoke to Reed. He told Reed the girl was extremely nervous and that she had her boy friend with her. Reed said, "Get the guy out of the office." Santoni returned to the deputies and asked Wahlke to leave, for if not the doctor wouldn't see the girl. Wahlke pleaded that he wouldn't harm anybody or anything and to ask the doctor if he could remain so that the girl would be calmer, that she was extremely nervous and needed moral support. Santoni returned to Reed and told him that the boy friend wouldn't leave. Reed said, "He has to leave or else; or else I can't see the girl." Santoni went back to the waiting room and told Wahlke he would have to go. He said, "The girl has to be here by herself"; that if he didn't get out right away, the doctor wouldn't do anything at all and that they could wait downstairs. (Overt act No. 11.)

Santoni picked up Wahlke by the arm and helped him out as he would not go. They left the office and went out into the hall. Miller stayed in the office. When they got outside the office, there were five or six police officers present and

Santoni saw them. The officers identified themselves and placed Santoni under arrest, with the $400 still in his pocket.

About that time, an attorney came up the stairs and asked what was going on. He was told it was a police matter. He entered the office next door to appellant. Immediately thereafter, the officers heard appellant's telephone ring. Due to the fact that the telephone had rung and that Miller was in the office by herself, they decided to enter immediately. They waited 30 seconds and then knocked on Reed's door. In approximately a minute Reed opened the door. The officers identified themselves and placed him under arrest on suspicion of abortion. Miller was still in the reception room. Reed stated that he had a gun in his pocket and the officers removed a .38 calibre revolver, fully loaded, from his right front trouser's pocket.

The officer took Reed back into his inner office and asked him about abortions and he stated he didn't have any knowledge of any abortions. The officers asked him why Santoni had brought this woman here and he said he had nothing to say—no statement. Wahlke observed the gynecology table with stirrups in the room. At that time, in plain sight on Reed's desk Wahlke observed an appointment book. Wahlke glanced through this appointment book. In the appointment book at 8 p. m. on July 3, 1958, an appointment is shown for "Alvie Santoni." In the appointment book at 9 p. m. on May 23, 1958, appears the name "Gloria Lancaster." These entries were made by Reed. Wahlke turned the appointment book over to the Los Angeles Police Department.

On January 10, 1959, Wahlke investigated another abortion in which Sunnie Belle Smith had been aborted by a woman. Sunnie stated to him that she had had an abortion the previous year by a Dr. Reed. She stated that she would have gone back this time but learned that he was out of business, that they called and couldn't get in touch with him and that he was not doing them any more. Wahlke told her they were investigating that case and asked if she would be willing to testify.

On January 16th or 17th they had a conversation at the police department. Sunnie stated that they had met Dr. Reed and that a woman by the name of Gloria had taken them. Sunnie was shown a photograph of Gloria Lancaster and identified her as being the woman who had participated in her abortion. The officers had been thumbing through the appointment book looking for Sunnie's name in the book. After

Sunnie mentioned this name, Wahlke referred to the appointment book and found the name "Gloria Lancaster" many times in the book. The name of Sunnie Belle Smith was not obtained from the appointment book.

By way of defense, Reed testified he is a doctor of medicine, specializing in obstetrics and gynecology. On May 23, 1958, he conducted his medical office at 1111 East Vernon Avenue, Los Angeles. He had no knowledge of ever having seen Sunnie Belle Smith prior to her appearance in court. He left his office about 8:30 the evening of May 23 and did not return. He and a friend went to visit the latter's boat and then proceeded to a restaurant where they remained until about 2 o'clock the next morning. At no time did he commit a criminal abortion on the person of Sunnie Belle Smith. He kept a record of every patient he treated, and her name, nor that of Gloria Lancaster appeared thereon. Reed does not recall having ever seen Gloria Lancaster prior to the proceedings involved in the instant case. She could have been a patient as he does not remember all his patients.

Santoni was a patient of appellant. During the month of December 1957 Reed had no record of having performed a dilation and curettage operation. Santoni did not bring any woman to his office for the purpose of his performing an abortion. Reed did not perform an abortion on any person that Santoni referred or brought to his office. He does not recall Santoni's bringing any woman to his office nor has he ever given Santoni any money. He never discussed money in connection with performing an abortion or the subject of abortions in other countries with Santoni.

Appellant contends that the evidence is legally insufficient to support the judgment holding him guilty of conspiring to commit abortions as charged in count I of the information. He further argues that because a codefendant, Gloria Lancaster, was adjudged not guilty of such crime he could not be found guilty of criminally conspiring with her. Count I charges Reed and Lancaster with unlawfully and feloniously conspiring together and with other persons to commit abortions. The foregoing evidence fully supports the inference that persons other than Gloria Lancaster conspired with Reed to commit abortions. "In a prosecution for conspiracy it is not essential to the conviction of a coconspirator that any or all other coconspirators shall be tried and convicted." (*People* v. *Calhoun,* 50 Cal.2d 137, 143 [323 P.2d 427]; see *People* v. *Gilbert,* 26 Cal.App.2d 1, 26 [78 P.2d 770];

*People* v. *Sagehorn,* 140 Cal.App.2d 138, 146 [294 P.2d 1062].)

The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the agreement. (Pen. Code, §§ 182, 184.) The agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute. It is not necessary that the overt acts be criminal. If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. Also the overt act may be performed by any one of the conspirators and yet be sufficient for the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. Once the conspiracy is established all evidence of the substantive crimes becomes admissible against all participants, even though the other conspirators are not present. (*People* v. *Frankfort,* 114 Cal. App.2d 680, 688-689 [251 P.2d 401].)

"It is settled that a conspiracy may be established by direct evidence or circumstantial evidence, or a combination of both. It need not be shown that the parties entered into a definite agreement, but it is sufficient if they positively or tacitly come to a mutual understanding to accomplish the act and unlawful design. The evidence may cover many transactions, extend over a long period of time, and show acts which occurred some time before the alleged formation of the conspiracy, as long as the facts shown have some bearing or some tendency to prove the ultimate facts in issue.

"Any competent evidence which tends to prove the existence of the conspiracy or any competent acts or declarations tending to show a common design is admissible." (*People* v. *Calhoun, supra,* 50 Cal.2d 137, 144.)

It is contended by appellant that the testimony of Hugh Corrigan, Sunnie Belle Smith and Aldo Santoni was not corroborated as required by sections 1108 and 1111 of the Penal Code.

Section 1108 of the Penal Code provides that upon a trial for procuring or attempting to procure an abortion or aiding or assisting therein, the defendant cannot be convicted upon the testimony of the woman upon or with whom the offense was committed unless she is corroborated by other evidence.

Section 1111 of the Penal Code provides that a conviction

408

cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof and defines an accomplice as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.

In *People* v. *Gallardo,* 41 Cal.2d 57, 62-64 [257 P.2d 29], it is said:

"A defendant charged with abortion 'cannot be convicted upon testimony of the woman upon or with whom the offense was committed, unless she is corroborated by other evidence.' (Pen. Code, § 1108.) Corroboration is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the woman is telling the truth. [Citations.] It has been held that the corroborative evidence need not by itself establish that the crime was committed or show all the elements thereof, but it must relate to some act or fact which is an element of the offense. [Citations.] It must create more than a suspicion, but it may be sufficient even though slight and entitled to but little consideration when standing by itself. [Citations.]

"A woman who has submitted to an abortion is not an accomplice of the persons charged with procuring or conspiring to procure the miscarriage. [Citations.] . . . Moreover, any one of the women upon whom an abortion was performed can act as a corroborating witness with respect to matters which she may have observed that are relevant to another count charging the performance of an abortion upon a different woman. [Citations.]

". . . Although the testimony of one woman that a person performed an abortion upon her is not of itself sufficient to corroborate the testimony of a second woman that the same person committed an abortion upon her [citations], it has been held that there is sufficient corroboration if the independent testimony of the women shows that each abortion was committed in a similar manner. [Citations.] . . . Under statutes similar to section 1108 of the Penal Code it has likewise been held that there is sufficient corroboration where each witness independently reveals the commission of a crime which is uniform in plan and pattern with the crimes described by the other witnesses. [Citations.]"

 In *People* v. *Goldstein*, 136 Cal.App.2d 778, 788-789 [289 P.2d 581], it is said:

" 'It is not necessary that the accomplice be corroborated as to every fact to which he testifies. If his testimony could be completely proven by other evidence, there would be no occasion to offer him as a witness. [Citations.] For the same reason, it is not necessary that the independent evidence be sufficient to establish the defendant's guilt. The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test.' [Citations.]

 ". . . 'When as in the present record it is discovered that there is testimony aside from that of the accomplice which tends to connect the defendant with the commission of the crime, the function of the appellate court is performed.' . . .

 "The corroboration may, of course, be furnished by defendant's own words or conduct. [Citations.]' "

 The corroborating evidence is sufficient, if, as here, it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the trier of fact that the witness who must be corroborated is telling the truth. (*People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257].)

 As shown by the evidence herein, the testimony of Sunnie and Corrigan is in large part corroborated by each other. The testimony of Santoni is substantially corroborated by Deputies Wahlke and Miller. The evidence, taken as a whole, is sufficient to meet the tests provided by the provisions of sections 1108 and 1111 of the Penal Code.

 It is next contended by appellant that the testimony of Sunnie and Corrigan was improperly admitted because it was derived from Reed's appointment book (Ex. No. 6) and that such book was obtained as a result of an unlawful search and seizure. From the evidence herein it is clear that the identity of Sunnie and Corrigan was obtained and most of their testimony was elicited independent of any information revealed by said book. Sunnie had given the arresting officers the name of Gloria and a sufficient description as to the person and office of Reed to link him with the charged conspiracy.

 Furthermore, no unlawful search or seizure of such appointment book is here shown as it was in plain view on appellant's desk at the time of the making of the lawful arrest.

The arrest was based on reasonable cause to believe that Reed was involved in a conspiracy to commit an abortion on Deputy Miller. ▮▮▮▮ ''A search which is made as an incident to a lawful arrest, based on reasonable cause to believe that the person arrested had committed a felony, is a lawful search even though made without a warrant.'' (*People* v. *Hammond*, 54 Cal.2d 846, 853 [9 Cal.Rptr. 233, 357 P.2d 289].)

▮▮▮▮ The arresting officers were entitled to conduct a search incident to the arrest of appellant for evidence bearing upon the crime of conspiracy to commit an abortion upon Miller. Wahlke testified that he observed, in plain sight on appellant's desk, an appointment book. He glanced through this appointment book and on the page for July 3, 1958, at 8 p. m., appeared the name ''Alvie Santoni.'' Clearly this was relevant and material evidence connecting appellant to the crime for which he was arrested, and could be validly seized as evidence to be used against appellant.

In *People* v. *Spicer*, 163 Cal.App.2d 678 [329 P.2d 917], the arresting officers observed defendant drop a cigarette. In recovering and offering the cigarette in evidence it was held there was no prohibited search or seizure. ▮▮▮▮ The court stated (p. 683) : ''As was said in *People* v. *West*, 144 Cal.App. 2d 214, 219, 220 [300 P.2d 729] : 'A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a ''search.'' ▮▮▮▮ A seizure contemplates a forcible dispossession of the owner and it is not a voluntary surrender.' . . .

''That to observe that which is open and patent is not a search was the holding in *People* v. *Martin*, 45 Cal.2d 755, 762 [290 P.2d 855] ; *People* v. *Jauregui*, 142 Cal.App.2d 555, 561 [298 P.2d 896].''

▮▮▮▮ Appellant contends that the seizure of the appointment book was illegal as the result of an exploratory search for evidence of abortions because the officers also seized a considerable quantity of appellant's medical records. He implies that the appointment book is tainted by the seizure of these other records, regardless of the fact that it was relevant to the offense for which appellant was arrested. He cites the case of *People* v. *Schaumloffel*, 53 Cal.2d 96, 102 [346 P.2d 393], which held that where the bounds of a reasonable search have been exceeded, neither the evidence wrongfully seized nor

any of its derivatives may be used against the defendant. The instant case is not analogous to the Schaumloffel case but rather to the case of *People* v. *Schmitt,* 155 Cal.App.2d 87 [317 P.2d 673], which was distinguished, but not overruled, by the Schaumloffel case.

In the case of *People* v. *Schmitt,* a chiropractor and another person were convicted of conspiracy to commit grand theft. When the chiropractor was arrested in his office, the officers had a warrant for his arrest on a misdemeanor charge of false advertising, but they did not have a search warrant. In that case there was a general ransacking of defendant's office, but the question was whether the evidence obtained illegally was used against defendant. It was said therein that the evidence used was obtained in a search that was permissible under the charge for which defendant was arrested and that the medical records which were received in evidence were connected with the commission of the crime for which he was arrested.

That is precisely the situation in the instant case. The appointment book bears a direct connection with the crime for which appellant was arrested, was properly seized and properly introduced into evidence.

The seized evidence, other than the appointment book, consisted of office records of appellant. On objection these were refused admission into evidence at the trial and, indeed, the dismissal of counts III, IV and V was based on the fact that the court determined the information leading to the names of the alleged abortees named therein was wrongfully obtained from such seized records.

From the facts and evidence herein recited and from the record in its entirety, measured by the foregoing rules, there is ample corroborative evidence of the conspiracy to sustain the judgment of the trial court of conviction of appellant as to count I of the information.

Directing our consideration to count II we conclude that, contrary to the contentions of appellant, there was sufficient evidence to support the conviction on this count in that there is substantial evidence corroborative of the testimony of Sunnie and Corrigan and to show that appellant violated the provisions of section 274, Penal Code, insofar as Sunnie was concerned.

Sunnie and Corrigan may corroborate each other's testimony. Sunnie, as the woman on whom the abortion was committed, was subject to prosecution under section 275 of

the Penal Code but not under section 274 prescribing punishment for abortion. She was not, therefore, an accomplice of defendant or of Corrigan who were subject to prosecution under section 274. ''So long as corroborating evidence creates more than a suspicion of guilt, it is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' [Citations.] It may consist of testimony of the defendant and inferences therefrom as well as inferences from the circumstances surrounding the criminal transaction [citations], and it need not establish the precise facts testified to by the witness whose testimony it supports. [Citations.]'' (*People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720].)

 Sunnie's testimony adequately corroborated that of Corrigan. His testimony in substantial part corroborated hers in that it meets the test required by sections 1108 and 1111 of the Penal Code by tending to connect the defendant with the offense. The acts and conversations of Sunnie, Corrigan and Gloria are clearly established prior to and at arrival and departure from the building in which defendant's office was located. The following facts sufficiently corroborate the testimony of Sunnie to establish that she was aborted in violation of section 274 of the Penal Code. Corrigan testified that he arranged for the person named Gloria to have an abortion performed upon Sunnie at 8 :30 p. m. on May 23, 1958, for the price of $400. At that time, they met Gloria for the avowed purpose of obtaining an abortion for Sunnie. Obviously their intent was an abortion. Corrigan drove Sunnie and Gloria to appellant's office building. While en route, Gloria stated that she had to talk to the doctor, indicating that they were going to see a medical man. This verifies the fact that a doctor was involved. At 10 o'clock in the evening, Gloria took Sunnie up a flight of stairs into the back of the office building. Late in the evening is quite unusual for a legal operation. Corrigan paid Gloria $400 before they went up the stairs. Why the clandestine, cash payment of so large a sum for a legitimate operation? Appellant's office was on the second floor of the building. Sunnie identified the office where, in company with Gloria, she met the doctor. She described him as being a tall, slender-build colored man which the evidence shows is a resembling description of appellant. The only two people present in the operating room were Gloria and the doctor. After discussing her pregnant condition with him he told her to take off her clothes, get on the

table and place her feet in stirrups. After the sheet had been placed over her and the mask applied to her nose and mouth both Gloria and the doctor told her to breathe deeply. After regaining consciousness the doctor told her to get dressed and handed her a sanitary napkin. He told her she should be all right, should have a slight discharge for a few days and should resume her normal periods which she later did. She did not have a child thereafter. Sunnie was in the building for three and one-half hours. This extreme length of time indicates a major operation, not a simple examination. When she returned to the car, Gloria stated that Sunnie was a little tired. It may reasonably be inferred that appellant was responsible for her changed condition. In the appointment book on appellant's desk, at 9 p. m. on May 23, 1958, he had written the name ''Gloria Lancaster.'' Whatever took place, he obviously participated. He kept a record of every patient he treated and there was no record of any treatment of Sunnie Belle Smith or Gloria Lancaster. If there was legitimate treatment performed that night why is there no record of it? It is to be noted that when appellant was arrested and was asked if he knew anything about abortions and why he had Deputy Miller in his office at the time of his arrest, he said that he had nothing to say—no statement.

The foregoing evidence and the inferences therefrom as well as the inferences surrounding the entire chain of events portrayed by the record herein furnish full support for the conviction of defendant for violation of section 274 of the Penal Code as charged in count II.

In support of appellant's contention of insufficiency of the evidence to support his conviction under count II he strongly relies on *People* v. *Feigin,* 174 Cal.App.2d 553 [345 P.2d 273], and *People* v. *Cummings,* 173 Cal.App.2d 721 [343 P.2d 944]. These cases are distinguishable from the instant case as to their facts and are not persuasive in light of the corroborative evidence here shown.

As stated in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] : '' 'We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the de-

fendant will not warrant interference with the determination of the jury.''

There being substantial corroborative evidence, the question whether, by itself, it is compatible with innocence as with guilt is a question for the trier of facts. (*People* v. *Odmann*, 160 Cal.App.2d 693, 698 [325 P.2d 495]; *People* v. *Berger*, 128 Cal.App.2d 509, 513 [275 P.2d 799].) The trial judge, as the trier of facts herein, having determined this question adversely to appellant, the judgment must stand.

The judgment and the order denying the motion for new trial with respect to both counts I and II are affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied February 16, 1961, and appellant's petition for a hearing by the Supreme Court was denied March 22, 1961.